775 N.W.2d 384 (2009)
278 Neb. 869
In re Interest of HOPE L. et al., children under 18 years of age.
State of Nebraska, appellee and cross-appellee,
v.
Benjamin L., appellant, and Joanna L., appellee and cross-appellant.
No. S-08-949.
Supreme Court of Nebraska.
November 13, 2009.
*387 Scott E. Sidwell, Kearney, of Legal Aid of Nebraska, Kearney, for appellant.
Stephanie R. Hupp, of McHenry, Haszard, Hansen, Roth & Hupp, P.C., L.L.O., Lincoln, for appellee Joanna L.
Gary Lacey, Lancaster County Attorney, Alicia B. Henderson, and Michelle Clarke, Senior Certified Law Student, for appellee State of Nebraska.
Dalton W. Tietjen, of Tietjen, Simon & Boyle, guardian ad litem.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
HEAVICAN, C.J.

I. INTRODUCTION
The parental rights of Benjamin L. (Ben) and Joanna L. to their four minor children, Hope L., Samuel L. (Sam), Xavier L., and Gracie L., were terminated. Ben appeals and Joanna cross-appeals that termination. We affirm the juvenile court's termination of parental rights.

II. FACTS
Ben and Joanna are the parents of Hope, born in October 2003; Sam, born in April 2005; Xavier, born in October 2006; and Gracie, born in February 2008. Xavier was removed from Ben and Joanna's custody on March 29, 2007, as a result of their arrests for the repeated disconnection of Xavier's feeding tube while he was hospitalized at Children's Hospital (Children's) in Omaha, Nebraska. Hope and Sam were removed from Ben and Joanna's custody the next day, March 30. Gracie was removed from Ben and Joanna's custody on February 29, 2008, shortly after her birth.

*388 1. XAVIER'S PREMATURE BIRTH AND SUBSEQUENT HOSPITALIZATIONS
Xavier was born at approximately 27 weeks' gestation. By all accounts, Joanna's pregnancy with Xavier was difficult. During the pregnancy, Joanna was treated several times for dehydration. Joanna's obstetrician, Dr. Sean Kenney, utilized both "NG tube" and "J tube" feedings in an attempt to help Joanna keep food down and gain appropriate weight. An NG tube delivers nourishment directly to the stomach; a J tube bypasses the stomach and delivers nourishment directly to the intestines.
According to Kenney's testimony, about 2 weeks after beginning the J tube feedings, Joanna stopped the feedings because she reported the feedings made her feel nauseous. However, because such feedings bypass the stomach, usually no nausea is experienced. Joanna was directed to restart the feedings, but did not do so. Joanna subsequently requested the removal of the J tube, but Kenney declined to remove it. Kenney testified that he did not want to remove the tube because, given Joanna's inability to gain weight, the tube might still be needed.
During Kenney's treatment of Joanna, he expressed concern that Joanna was suffering from an eating disorder. Joanna had spent much of her youth in various forms of treatment for anorexia nervosa. Kenney recommended more aggressive care, but because both Ben and Joanna denied that Joanna was suffering from an eating disorder, such treatment was refused. Joanna was eventually hospitalized on September 24, 2006, and remained so until Xavier's birth on October 31. During her hospital stay, Joanna still did not gain weight as expected. No medical reason could be found for this failure. However, on two occasions, a nurse discovered that Joanna's feeding tube had been disconnected. Kenney also testified that during this hospital stay, Ben and Joanna repeatedly stopped and restarted the tube feedings.
Following Xavier's birth in October 2006, he spent 2 months in the neonatal intensive care unit at St. Elizabeth Regional Medical Center in Lincoln, Nebraska (St.Elizabeth). According to one of Xavier's physicians, his medical course was uncomplicated while in the intensive care unit and Xavier gained weight appropriately.
Upon Xavier's discharge on December 23, 2006, Ben and Joanna were informed that some of Xavier's feedings needed to be supplemented with human milk fortifier. Ben and Joanna were provided a can of human milk fortifier containing a 2- to 3-week supply and were instructed on its use. Just 3 days later, however, Ben and Joanna indicated to Xavier's physician, Dr. Alicia Cruce, that they were not feeding Xavier as ordered.
Once home from St. Elizabeth, Xavier failed to appropriately gain weight. He was again admitted to St. Elizabeth on January 10, 2007. Due to Xavier's lack of weight gain, Cruce increased the number of fortified milk feedings from two per day to three per day. During this hospitalization, Xavier gained weight well. Xavier was discharged from the hospital on January 17, but by this time, Joanna had been admitted to St. Elizabeth for a purported flareup of Crohn's disease. Throughout these events, and in the medical records from this case, Joanna asserted that she has Crohn's disease; however, testing has determined it is unlikely that she has the disease.
While hospitalized, Joanna was treated with morphine for pain. As a result, Joanna was informed by a nurse assigned to her that she should not breastfeed and that she should "pump and dump" any breast milk she produced during the time *389 she was on the morphine. According to the nurse, 12 percent of a morphine dose would be transmitted via the breast milk, or about twice the dosage a child of Xavier's age should receive. However, the nurse testified that he observed Joanna breastfeeding Xavier. Another nurse testified that she also saw Joanna apparently breastfeeding at a time when she was on morphine.
Despite indicating her understanding of the instruction to "pump and dump" the breast milk, Joanna kept 6 to 10 cups of what appeared to be breast milk, marked with her name and the word "morphine," in a common refrigerator located at St. Elizabeth. The milk was disposed of only after one of Cruce's medical partners was contacted. That doctor spoke with Joanna, then instructed nursing staff to pour the morphine-tainted milk down the sink.
Ben and Joanna deny that either was initially informed of the dangers of Joanna's breastfeeding Xavier while she was on morphine. Joanna testified that once she was informed that she should not breastfeed, she stopped doing so. Joanna testified that there was no intention to save the breast milk pumped while Joanna was on morphine, but that she and Ben believed that breast milk, whether or not it contained morphine, was a biohazard that had to be properly disposed of. According to both Ben and Joanna, special steps had to be taken at Children's to dispose of such milk. However, several nurses, including Ben's mother, who is a licensed practical nurse in the St. Elizabeth neonatal intensive care unit, testified that at St. Elizabeth, the milk could simply be poured down the sink or toilet.
Joanna was subsequently discharged. But on January 30, 2007, Xavier was readmitted to St. Elizabeth for poor weight gain. That day, Ben and Joanna informed yet another nurse that they were only breastfeeding Xavier. That nurse testified that she asked about the fortified milk and that the parents avoided answering her question, but reaffirmed that Xavier was getting breast milk. However, Ben and Joanna later insisted to Cruce that Xavier was, in fact, getting the prescribed three bottles of fortified milk.
The next day, January 31, 2007, Cruce contacted Child Protective Services. Cruce expressed concern that Ben and Joanna were not adequately feeding Xavier, because he would gain weight in the hospital but not at home. Cruce could find no medical explanation for Xavier's continued lack of weight gain. Child Protective Services met with Joanna at St. Elizabeth on February 2 and obtained Joanna's signature on a safety plan which indicated she would follow doctors' orders regarding Xavier's feedings. Ben signed that same safety plan on February 9.
On February 16, 2007, Xavier was brought to St. Elizabeth with parental reports of diarrhea and vomiting. Dr. Michelle Walsh, a medical partner to Cruce, admitted Xavier to the hospital due to his low glucose levels. However, Walsh questioned Ben and Joanna's reporting, because diarrhea or vomiting will cause a drop in carbon dioxide levels and Xavier's levels were normal.
In an attempt to raise his glucose levels, Xavier was given fluids intravenously and blood was drawn and tested every 2 hours. After several hours, Xavier's glucose levels were still not acceptable. It was then reported to Walsh that Xavier's intravenous line had been disconnected on two separate occasions. Walsh testified that Xavier could not have disconnected it himself; that in Walsh's 10 years of practice, she had never seen a disconnect in a patient Xavier's age; and that in both instances, Joanna was the only person *390 in Xavier's room around the time of the disconnects.
During this hospitalization at St. Elizabeth, it was determined that Xavier suffered from hydrocephalus, or extra fluid in his brain. Xavier was transferred to Children's for treatment of the hydrocephalus and placement of a shunt. During this hospitalization at Children's, parental reports of vomiting and fussiness were made, but never confirmed or observed by Children's staff. Xavier was discharged on February 23, 2007, but readmitted on February 27 and 28 for surgery to repair an inguinal hernia.
A few days later, on March 2, 2007, Xavier was yet again admitted to Children's due to his failure to appropriately gain weight. Various tests were performed in an attempt to determine why Xavier was not gaining weight, but no medical reason could be found to explain this failure. During the course of this testing, an NG tube was placed. Such a tube runs through the nasal passages, down the back of the throat, and into the stomach. According to Dr. Jay Snow, one of Xavier's treating physicians at Children's, Xavier's condition was progressing toward the need to perform a "fundoplication," a surgery in which the top part of the stomach is wrapped around the esophagus, as well as placement of a "gastrostomy button" (G-button), before it was determined that Xavier's feedings were being interrupted.
On March 19, 2007, a 2-week feeding trial using the formula Neocate was begun and Xavier was fed via an NG tube. At the end of the tube were two ports: a main port and a side port. The tube is capped when not in use; when in use, the tube is connected via the main port to a bag containing formula (or whatever is being fed to the patient). The side port is generally used for administering medicine. Even before the beginning of this feeding trial, several nurses reported that the NG tube was being manipulated and that formula was leaking out of the tube or that "burp rags" were wet with reported emesis, or "spit up." Tests conducted on March 22 concluded that Xavier was starving. At that time, a decision was made to have a nurse present in Xavier's room at all times to monitor whether Ben or Joanna were manipulating the feedings. During this time, nurses reported several instances in which it appeared that Xavier's NG tube was being manipulated. After 2 days, Children's ceased such monitoring and contacted the Omaha Police Department (OPD).
Beginning on March 29, 2007, OPD began conducting a video surveillance of Xavier's room. During the approximately 7 hours when the room was under surveillance, a detective with OPD observed Joanna disconnect Xavier's feeding tube 25 times and tamper with the tube another 12 times. The detective ceased surveillance and transported Joanna to OPD headquarters for questioning. During that questioning, Joanna admitted that she typically would disconnect Xavier's tube about eight times per day and let the tube drain for 10 to 15 minutes each time. Joanna admitted, contrary to the video evidence, that she had disconnected the tube only twice on that day. Joanna was specifically asked if she or Ben were giving Xavier any breast milk; she replied that they were not and that she was "saving it all."
Ben, who was not present in Xavier's room at the time of the surveillance, was also interviewed. Ben first indicated that he or Joanna would pour formula from the refrigerator onto the "burp rags" as evidence of Xavier's continued emesis. But Ben eventually acknowledged that the couple had disconnected the tube and drained food from it. Ben stated that the tube *391 would be drained for up to an hour at a time.
In contrast to their statements to OPD, Ben and Joanna both testified at the termination hearing that they were adding breast milk back into the feeding tube using a syringe. Joanna also testified that she occasionally would breastfeed Xavier. Joanna indicated that they hid these actions from hospital staff. Ben testified that he and Joanna would occasionally present formula-soaked "burp rags" to the hospital staff and represent that it was Xavier's natural emesis in an attempt to stop the Neocate trial. Ben explained that he and Joanna were concerned because the Neocate contained corn, to which Ben claims Xavier was allergic.
Ben and Joanna were arrested for child abuse. Both eventually pleaded no contest to felony child abuse. Meanwhile, Xavier remained at Children's for several days following the arrests of Ben and Joanna. During that time, Xavier showed steady weight gain, first on Neocate, then later, on another formula. All NG tube feedings were ceased only days after Xavier was removed from Ben and Joanna's custody. Since his discharge from Children's in April 2007, Xavier has been hospitalized one time, for treatment of a relatively common respiratory virus. Xavier has gained or maintained his weight since that time, and has since switched to a regular diet including whole milk. In addition, Xavier has had tubes placed in his ears and his shunt has been replaced. The ambulance was called on one occasion because Xavier was crying, coughing, and possibly having a seizure. Otherwise Xavier's office visits to Cruce have been for routine well-child checks or for seasonal-type illnesses.
There was testimony from several physicians about the effect on Xavier of the disconnection of the feeding tube. Snow testified that Xavier was being starved and that he would have had hunger pains. Snow further testified that children who are starved have developmental delays. He also testified that cognitive functioning can be affected. According to Snow, a younger infant is at greater risk for these problems. A pediatric gastroenterologist, who is a feeding and growth specialist from Children's, testified that a child Xavier's age who is starved suffers problems with brain development and with the immune system. Another doctor, also from Children's, testified that such starvation can cause mild to significant developmental delays and an increased risk of infection and that the younger the age, the greater the effect the starvation will have on a child.

2. HOPE'S EATING ISSUES AND FAILURE TO THRIVE
Hope was born at full term following an uncomplicated pregnancy. Hope apparently gained weight appropriately until she was about 18 months of age. But beginning in the summer of 2004, Hope began to lose weight, and in January 2005, she was diagnosed with failure to thrive. Hope was referred to Children's. During a period of hospital observation, Hope was diagnosed with rotavirus and was fed at night by an NG tube. Hope was discharged with the NG tube still in place, and her parents were instructed to follow up with the feeding and growth clinic at Children's. The clinic told Ben and Joanna that if the tube fell (or was pulled) out, they should wait a few days to see if Hope would eat appropriately before attempting to have the tube replaced. Contrary to this advice, on one occasion, the tube fell out and Hope was brought to the emergency room (ER) within 30 minutes to have the tube replaced.
*392 In addition to the purported eating issues, Cruce testified as to Hope's medical problems in the summer and fall of 2005. Ben and Joanna reported that Hope was often constipated but, despite testing, this could never be confirmed. Conversely, Hope was often brought in with complaints of diarrhea.
Hope also had tubes placed in her ears and had her adenoids removed. Though Hope had had relatively few ear infections, these surgeries were performed on the basis of parental reports that Hope was continually pulling at her ears.
Hope's medical history also reveals several office visits in which parental reports did not match Cruce's observations. In October 2005, Hope was reported to be fussy, but Cruce observed that Hope was playing and running in circles during the visit. And in November, parental reports indicated that Hope had been fussy and had refused to drink any fluids for the prior 24 hours; Cruce observed that Hope was playful and that she drank 3 ounces of fluid. Later in November, Hope was brought in for a dog bite which turned out to be only a scratch.
In addition, in the spring of 2005, Cruce began seeing Hope for asthma symptoms, particularly wheezing. Cruce testified that, in fact, she heard no wheezing when examining Hope, but indicated that such was not unusual as parents often mistake upper airway noise for wheezing. But Hope was continually seen for wheezing despite being put on different treatments. A few months later, for the first time, Joanna indicated that the wheezing became worse when Hope would run. Cruce testified that in the nine visits in which she saw Hope, at least in part for wheezing complaints, on only one of those occasions was Hope actually wheezing.
Similar to Cruce's testimony regarding the November 2005 visit, Snow testified that in January 2005, Hope had been admitted to Children's based upon reports that she had stopped eating 24 hours earlier. But within a short time after admission, Hope was eating pizza, drinking water, and found to have a wet diaper.
In early 2006, due to Hope's continued and apparent refusal to eat, she was again fed by an NG tube and later had a G-button placed. When compared with an NG tube, which can be placed bedside, the placement of a G-button is a surgical procedure.
As will be discussed below, Hope has been diagnosed with posttraumatic stress disorder (PTSD) as a result of the various medical interventions experienced by herself and members of her family. As for medical care, since removal from Ben and Joanna's custody, Hope has had no hospitalizations or ER visits. Hope has been to the doctor for well-child checks, for allergy/cold symptoms, and to have her G-button removed.

3. SAM'S EATING ISSUES AND FUNDOPLICATION
Sam was also born full term following an uncomplicated pregnancy. He was breastfed, and Ben and Joanna reported that he suffered from reflux. Because of Sam's reflux, Joanna, who was breastfeeding, began excluding foods from her diet. Eventually, Sam was diagnosed with milk soy protein intolerance. Sam had many medical contacts for the alleged reflux and for other issues. The record largely indicates that parental reports received from Joanna were not consistent, either with each other or with the symptoms being observed by the medical professionals providing Sam's care.
For example, on May 28, 2005, Sam saw Walsh for an appointment. At this time, no mention was made that Sam was suffering *393 from constipation. Later that same day, Sam was brought to the ER because of a scratch on his eyelid. Again, during that visit, no mention was made of constipation. But 2 days later, on May 30, Sam was brought to the ER with a report that he had been constipated for the prior 4 weeks and had not had a bowel movement in 4 days. Testing revealed no signs of constipation. The next day, May 31, Sam was brought to Cruce's office with parental reports of projectile vomiting and having not had a bowel movement for 5 days.
On June 30, 2005, Sam was admitted to Children's as a result of parental reports of continuing reflux issues, though testing continued to reveal nothing medically wrong. During the patient admission process, Joanna, with Ben present, indicated that Sam had blood in his stools and provided stool samples which tested positive for blood. In fact, stool samples had been ordered for Sam, but none tested positive for blood, a fact of which Joanna was aware. As a result of this claim, Sam had a flexible sigmoidoscopy, a scope of the rectum and lower colon. The risks of this procedure include bleeding and infection, as well as risks inherent with general anesthesia.
Joanna also informed doctors at Children's that Sam had previously undergone an upper gastrointestinal test which was positive for reflux. However, Sam's upper gastrointestinal test was not positive for reflux, a fact which 1 month earlier, Ben and Joanna had admitted to an ER doctor.
Finally, Joanna informed doctors at Children's that Sam had had several instances of apnea. While Sam's apnea monitor had alerted on several occasions, the alerts were not true apnea alarms. In reality, Sam had had no apnea episodes, a fact of which Joanna had been informed prior to Sam's admission to Children's.
On July 11, 2005, Joanna reported to Cruce that Sam had not improved. Sam was then admitted to St. Elizabeth. During the admission process, Joanna again informed medical staff that Sam had previously had blood in his stools. During this admission, a metabolic workup was done which showed Sam was in a starvation state and had not been receiving proper nutrition. Several days later, while still at St. Elizabeth, Joanna reported that Sam was fussy and continuing to reflux half-strength breast milk. But the nursing staff reported that Sam was not fussy. During this hospitalization, Sam lost weight. However, no medical reason could be found for his fussiness or weight loss.
Sam was transferred to Children's on July 18, 2005, due to parental reports of continued fussiness and reflux. According to parental reports, the situation had not improved by July 20; however, Children's staff observed no fussiness or reflux. Despite this, on July 26, based in part upon the above information provided by Joanna, a fundoplication was performed on Sam. This is major surgery which can cause scarring and can occasionally result in death. In connection with this surgery, a G-button was placed so that Sam could be burped after feedings. Subsequent to this surgery, the site of Sam's G-button became infected. Because of the G-button, Sam also experienced less time spent lying on his stomach and needed physical therapy as a result.
In the months following the fundoplication, Sam continued to have visits with Cruce, though none were for reflux concerns. Parental reports included continued fussiness and multiple watery stools, but nothing was found to explain such stools. In each instance where fussiness was complained of, Cruce reported the opposite: that Sam was happy, alert, and smiling. In one particular instance on December *394 15, 2005, it was reported that Sam was lethargic, retching, and could not hold his head up, Cruce noted none of that in her notes; to the contrary, Cruce noted Sam was "happy, smiling, sitting well without help, and . . . had good head control." Later that day, Sam reported to the ER for the same symptoms; he was admitted to St. Elizabeth but released the next day.
In contrast, since his removal from the custody of Ben and Joanna, Sam has had no hospitalizations or ER visits. He has seen the doctor for wellchild checks and for seasonal allergies and illness. And as will be discussed in more detail below, Sam has since been diagnosed with "Adjustment Disorder with Anxiety," primarily as a result of the anxiety associated with his removal from Ben and Joanna, and also with "Pervasive Developmental Disorder."

4. GRACIE'S BIRTH AND REMOVAL
Gracie was born in February 2008. By this time, Hope, Sam, and Xavier had all been removed from Ben and Joanna's custody and were living together in a foster home. According to Ben, Joanna, and Joanna's new obstetrician, Joanna suffered from hyperemesis during her pregnancy with Gracie, but the condition was more controlled than it was during her pregnancy with Xavier. Though Ben and Joanna arranged for family friends to act as Gracie's guardian, Gracie was removed from Ben and Joanna's custody at the hospital and placed with Hope, Sam, and Xavier.

5. STATE'S TESTIMONY REGARDING BEST INTERESTS
Several doctors testified that the best interests of Hope, Sam, Xavier, and Gracie would be served by terminating the parental rights of Ben and Joanna. First to testify on this point was Dr. Jeffrey DeMare, the medical director of the children's advocacy team at Children's. DeMare has extensive qualifications in the areas of child medical care and analysis, as well as the treatment of child abuse. DeMare examined the medical records of Hope, Sam, and Xavier, and also examined the surveillance video taken by OPD. Based upon that review, DeMare opined that Hope, Sam, and Xavier had all suffered from child abuse at the hands of Ben and Joanna. DeMare specifically diagnosed all three children with factitious disorder by proxy, also known as Munchausen syndrome by proxy. DeMare opined that to reunify the children with Ben and Joanna would put all the children at risk for further health issues, including death. DeMare was even more concerned for Hope and Sam than for Xavier based upon the "repeated and escalating nature of abuse." DeMare noted that he could not "conceive of a scenario by which these children, or any other children, would be safe from harm in these parents' care." Finally, DeMare indicated his concern that no doctor would be able to confidently treat the children given the risk that the parents would not provide correct information to the treating medical professionals.
Dr. Mannhan Pratap Pothuloori also testified regarding the best interests of the children. Pothuloori is the chief of the psychiatry division at BryanLGH Medical Center in Lincoln. Pothuloori also began treating Joanna for an eating disorder in 1996. Pothuloori testified that it was not safe for the children to be in the care of Joanna, nor was it likely to be safe in the future. This opinion was based upon a variety of factors, including Joanna's multiple mental health diagnoses. Those diagnoses included anorexia nervosa, purging and restricting type; major depressive disorder; possible PTSD; obsessive-compulsive symptoms; psychotic disorder, not otherwise specified; and borderline personality *395 disorder. Moreover, Pothuloori diagnosed Joanna with both factitious disorder and factitious disorder by proxy.
With respect to the diagnosis of factitious disorder by proxy, Pothuloori distinguished it from the pediatric definition with which the children were diagnosed. Specifically, the patient, in this case Joanna, performs improper acts regarding the children's medical conditions so that she can gain psychological benefit.
Pothuloori testified that even excluding the factitious disorder and factitious disorder by proxy diagnoses, her opinion regarding Joanna would still be "severely guarded." Pothuloori explained that her opinion was based upon the fact that Joanna had multiple hospitalizations, had not been very compliant, did not adhere to treatment, and had multiple relapses.
Dr. Judith Bothern, the children's therapist, also testified. Bothern is the clinical psychologist who had been treating Hope and Sam since their removal from Ben and Joanna's custody. In connection with her treatment of Hope and Sam, Bothern has also observed the foster family as well as Xavier and Gracie. In addition to her sessions with the various children and foster mother, Bothern also reviewed the children's medical histories, Joanna's medical and mental health records, visitation reports, and Child Protective Services' documentation. Bothern testified that she believed it was in the best interests of Hope, Sam, Xavier, and Gracie that the parental rights of Ben and Joanna be terminated.
Bothern indicated that she has watched the children struggle with problems caused by the behavior of Ben and Joanna. Bothern indicated that she had attempted to work with Ben and Joanna to make decisions which would not traumatize the children, in particular Hope. Bothern testified that Ben and Joanna still "try to avoid the help that was there [from DHHS] and to deceive people and [that she does not] know how we can protect these children any other way [besides terminating parental rights]." Bothern also indicated that she did not believe remedial efforts aimed at the parents would be successful, because such attempts had previously been tried and had been unsuccessful.
Bothern diagnosed Hope with PTSD as a result of the trauma related to her own medical procedures, as well as the disruptions caused by the medical procedures performed on Sam and Xavier. According to Bothern, Hope is ultrasensitized to medical-related issues and after exposure to such issues, Hope becomes upset, acts babyish, or cries and pretends to have "owies."
Also of concern to Bothern was the fact that while in therapy sessions, Hope was very "guarded" when the topic of her parents was raised, but she was not similarly guarded in any other areas. Bothern also relates that while in therapy, if Bothern raised the topic of Xavier's birth or Sam in his infancy, Hope would "disassociate" and it would be difficult to rouse her out of this state. Sometimes upon being brought back to reality, Hope would make some mention of "Xavier being sick." Bother relates an incident from visitation in which Hope was not getting attention from her father; Hope began to simulate choking and gagging and attempted to throw up in order to gain that attention.
Bothern also testified to an incident at a visitation during Joanna's pregnancy with Gracie in which Joanna arrived with a medical device in a backpack. According to Bothern, the backpack beeped during visitation and Joanna left the room to deal with it. Hope and Sam "rushed her immediately when she came out which looked to me like insecurity and some fear related to that." On the topic of the backpack, at *396 some point, Joanna was no longer wearing it and Hope reported to Bothern that "mom didn't need the backpack anymore because she wasn't sick and she had [the backpack] because she was sick." To Bothern's knowledge, no one had mentioned to Hope anything about the backpack or why Joanna needed it.
In addition to Hope's diagnosis, Bothern diagnosed Sam with an adjustment disorder with anxiety, due to both Sam's removal from Ben and Joanna and his concerns about Gracie's whereabouts. Bothern testified that after Gracie was placed in the foster home, both Hope and Sam were "constantly looking for where the baby was" and would continue to seek her until they found her. Sam continued this behavior even after Hope stopped. Sam was also diagnosed with pervasive developmental disorder, which raises the concern that he might have a disorder on the autism spectrum.
Bothern made specific reference to Ben's involvement and whether his paternal rights should be terminated when arguably Joanna was the party making the bulk of the false reporting which had led to the allegedly unnecessary medical procedures. Bothern stated:
Of additional concern is [Ben's] complicity on all levels from participating in unhooking [Joanna's] feeding tube while hospitalized and pregnant with Xavier (detrimental to mother and child), complicity in demands for more extensive and invasive treatment for his children, and his admitted participation in unhooking and draining nutrients from Xavier's feeding tube while hospitalized. In addition, [Ben] was inquiring about late term abortion with Xavier in September and again in October due to his wife's discomfort. While Xavier was in the hospital, [Ben] was keeping detailed records where he clearly tracked the weight that Xavier lost and/or failed to gain, yet continued to unhook the feeding tube with clear awareness that he was starving his own child. [Ben's] complicity indicates that he lacks the ability or desire to contradict his wife's wishes, his own denials regarding his wife's medical history after meeting and marrying her, his own focus on medical issues keeping significant weight records so that he was well aware of starving his son, his own willingness to harm both his wife and his children, and his inability to provide protection for any of them. For whatever reason [Ben] has engaged in this activity, it clearly indicates not only his complicity (both active and tacit) in the alleged abuse, but his unwillingness or inability to protect his children.

6. PARENTS' TESTIMONY REGARDING BEST INTERESTS
Ben and Joanna also presented the testimony of a psychologist, Dr. Audrey Wiener. Wiener was hired by Ben and Joanna to evaluate them in connection with the Douglas County criminal charges. In testifying and offering her opinion, Wiener reviewed some documentation regarding the family. She reviewed a summary of the medical records for the entire family. Wiener also interviewed Ben and Joanna but did not evaluate the children.
Wiener testified she believed that with adequate support, Ben and Joanna could both parent. Wiener recommended that the family be provided with intensive family preservation services. Wiener indicated in her testimony that her opinion was formed before receiving the opinions of DeMare and Bothern, but that those opinions did not affect her recommendation. In addition, Wiener indicated that she was suspect of Cruce's opinion because she believed it to be formed in hindsight. Wiener *397 did acknowledge, though, that she did not speak with Cruce, see her testify, know the content of Cruce's testimony, or review the actual medical records. Wiener also indicated that her review of the underlying medical records was not sufficient for her to conclude what impact Snow's opinion that Sam's fundoplication was unnecessary might have on her own opinion. Wiener did acknowledge that credible medical evidence that the children were not given proper medical treatment might change her opinion.
Wiener also indicated that she did not consider the safety plan Ben and Joanna signed, in which the couple agreed to follow all medical advice, and that Ben and Joanna's failure to follow through with the plan did not change her opinion. In addition to Wiener's less than complete review of applicable medical records, as noted, Wiener was retained in connection with the criminal case, not the termination case. As such, Wiener did not interview Ben and Joanna as to Hope and Sam, but only as to Xavier.

7. REMOVAL OF GUARDIAN AD LITEM
During the termination hearing, Ben and Joanna asked to have the guardian ad litem (GAL) removed. Ben and Joanna argued that the GAL had shown he was not neutral by "inserting" himself as a witness in Ben's and Joanna's criminal cases, improperly attempting to influence their sentences. During that sentencing, the GAL provided information to the probation officer preparing presentence reports for Ben and Joanna. The juvenile court denied the motions.

8. TERMINATION OF PARENTAL RIGHTS
In its fourth amended petition, the State alleged that Ben's and Joanna's parental rights should be terminated because such termination was in the best interests of all four children. In addition, the State alleged the conditions as set forth in Neb. Rev.Stat. § 43-292 (Reissue 2008), specifically, subsections (2) (neglect) and (4) (unfit by reason of debauchery), existed for all four children. The same allegations were made with regard to Hope, Sam, and Xavier, as well as subsections (8) (causing serious bodily injury), (9) (subjected to aggravated circumstances), and (10)(d) (felony resulting in serious bodily injury). The State also alleged that under Neb.Rev. Stat. § 43-283.01 (Reissue 2008), it did not need to make attempts to reunify the family.
The juvenile court concluded that reunification attempts were not necessary and that termination was in the best interests of the children. The juvenile court also found statutory grounds to support termination as to Gracie under § 43-292(2), and as to Hope, Sam, and Xavier under § 43-292(2), (8), and (9), and (10)(d). The court dismissed the allegation of § 43-292(4) for failure of proof.

III. ASSIGNMENTS OF ERROR
On appeal, Benjamin assigns, restated and renumbered, that the juvenile court erred by (1) admitting evidence of Joanna's mental health history which predated the birth of her children, (2) concluding that reasonable efforts to preserve and reunify the family were unnecessary, and (3) terminating his parental rights.
On cross-appeal, Joanna assigns, restated and renumbered, that the juvenile court erred by (1) admitting evidence of her mental health and criminal history, (2) concluding that reasonable efforts to preserve and reunify the family were unnecessary, (3) terminating her parental rights, and (4) not removing the guardian ad litem.

*398 IV. STANDARD OF REVIEW
Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings.[1] However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.[2]

V. ANALYSIS

1. ADMISSIBILITY OF MENTAL HEALTH AND CRIMINAL HISTORIES
In their first assignments of error, Ben and Joanna both assign that it was error for the juvenile court to admit Joanna's mental health and medical history predating the birth of the children. Ben does not actually address this assignment of error in his brief. In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error; therefore, we decline to address Ben's assignment.[3] But Joanna does assign and argue this issue, and accordingly, we address her arguments. In addition to arguing that her mental health and medical histories were inadmissible, Joanna argues that it was error to admit her criminal history.
We turn first to Joanna's criminal history. There is no mention made of Joanna's criminal history in the juvenile court's order. Nor does Joanna argue in her brief precisely what evidence should have been excluded. But the record shows that Joanna once made false accusations of rape against at least one man that she worked with. According to the record, Joanna felt pressured to have sex with the man and did so, but then felt guilty afterward.
Given our review of this record, even assuming that the admission of this evidence was in error, it was harmless. Our review is de novo on the record; any error is cured so long as this court does not rely on the challenged evidence. Improper admission of evidence in a parental rights proceeding does not, in and of itself, constitute reversible error, for, as long as the appellant properly objected, an appellate court will not consider any such evidence in its de novo review of the record.[4] Because, as explained in more detail below, there is sufficient evidence to support the termination of Joanna's parental rights, her argument with respect to her criminal history is without merit.
Turning next to Joanna's mental health and medical histories and diagnoses, Joanna argues that any history predating the birth of the children is too remote to be probative, that the diagnoses in question were provided by doctors other than her treating physicians, that there was no causal connection shown between the histories and the alleged parenting problems, and that the history was unduly prejudicial. Joanna contends there is no indication that any of her alleged diagnoses affect her ability to parent or would be sufficient to support the termination of her parental rights and that it was inappropriate for the juvenile court to rely on this past medical history as a basis for the termination of her parental rights.
*399 To the extent Joanna argues that the juvenile court terminated her parental rights because she has a mental illness, such is not borne out in the juvenile court's decision. Rather, the juvenile court considered Joanna's illnesses within the framework of whether Joanna could be rehabilitated and whether it was in the children's best interests to have Joanna's rights terminated.
We conclude that the juvenile court did not err in admitting evidence of Joanna's mental health and medical issues experienced prior to the birth of the children, and we reject Joanna's argument to the contrary. This court has stated that a court is not prohibited from considering prior events when determining whether to terminate parental rights.[5] The challenged evidence is relevant to what happened to Hope, Sam, and Xavier. First, the evidence shows a pattern of medical intervention sought by Joanna for herself, which is relevant when considered in light of what was alleged to have occurred to her children. But even more importantly, the evidence shows the depth of Joanna's mental health issues and the multiple attempts at treatment that Joanna, for the most part unsuccessfully, underwent. Whether Joanna recognizes her mental health issues and whether she responds to treatment are both highly relevant to whether it is in the best interests of Hope, Sam, Xavier, and Gracie that Joanna's parental rights be terminated.
Joanna's first assignment of error is without merit.

2. NECESSITY OF REASONABLE EFFORTS TO REUNIFY FAMILY
Both Ben and Joanna next assign that the juvenile court erred by concluding that it was not necessary for the State to make reasonable efforts to reunify the family. At issue is § 43-283.01(4), which provides in relevant part that
[r]easonable efforts to preserve and reunify the family are not required if a court of competent jurisdiction has determined that:
(a) The parent of the juvenile has subjected the juvenile to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse;
(b) The parent of the juvenile has (i) committed first or second degree murder to another child of the parent, (ii) committed voluntary manslaughter to another child of the parent, (iii) aided or abetted, attempted, conspired, or solicited to commit murder, or aided or abetted voluntary manslaughter of the juvenile or another child of the parent, or (iv) committed a felony assault which results in serious bodily injury to the juvenile or another minor child of the parent; or
(c) The parental rights of the parent to a sibling of the juvenile have been terminated involuntarily.
We discussed § 43-283.01 in some detail in In re Interest of DeWayne G. & Devon G.[6] We began by considering § 43-283.01 in light of the entire juvenile code. We then noted that with regard to
the termination of parental rights pursuant to § 43-292, the Legislature incorporated § 43-283.01 into only § 43-292(6). Subsection (6) now states that parental rights can be terminated when, "Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts to preserve and reunify the family *400 if required under section 43-283.01, under the direction of the court, have failed to correct the conditions leading to the determination." Section 43-283.01 is not incorporated into any of the other grounds for seeking termination of parental rights.
We additionally note that the plain language of §§ 43-284, 43-254, 43-1315, and 43-292(6), as amended by the Legislature in 1998, recognizes that determinations regarding reasonable efforts are necessary only "if required" under § 43-283.01. Section 43-283.01 limits situations in which the State is required to provide reasonable efforts to preserve and reunify, by completely eliminating any such requirement in those situations contemplated under § 43-283.01(4)(a), (b), and (c).
Construing this statutory framework in pari materia, we determine that the issue of reasonable efforts if required under § 43-283.01 must be reviewed by the juvenile court (1) when removing from the home a juvenile adjudged to be under subsections (3) or (4) of § 43-247 pursuant to § 43-284, (2) when the court continues a juvenile's out-of-home placement pending adjudication pursuant to § 43-254, (3) when the court reviews a juvenile's status and permanency planning pursuant to § 43-1315, and (4) when termination of parental rights to a juvenile is sought by the State under § 43-292(6).[7]
In In re Interest of DeWayne G. & Devon G., we clearly indicated that reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under § 43-292(6); we reaffirm that holding today. In this case, termination was not sought under § 43-292(6); it was sought under § 43-292(2), (4), (8), (9), and (10)(d). It was not necessary for the State to make reasonable efforts to reunify this family, and Ben's and Joanna's assignments of error to the contrary are without merit.

3. TERMINATION OF PARENTAL RIGHTS
We now turn to the question of whether the juvenile court properly terminated Ben's and Joanna's parental rights. It is axiomatic that under § 43-292, in order to terminate parental rights, the State must prove, by clear and convincing evidence, that one or more of the statutory grounds listed in this section have been satisfied and that termination is in the child's best interests.[8] And the proper starting point for legal analysis when the State involves itself in family relations is always the fundamental constitutional rights of a parent.[9]

(a) Finding of Statutory Grounds
We have explained that the interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court. Accordingly, before the State attempts to force a breakup of a natural family, over the objections of the parents and their children, the State must prove parental unfitness.[10] A court may not properly deprive a parent of the custody of his or her minor child unless the State affirmatively establishes that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right.[11] It is *401 always the State's burden to prove by clear and convincing evidence that the parent is unfit and that the child's best interests are served by his or her continued removal from parental custody.[12] We have noted that the term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests.[13]
In this case, the juvenile court found that the State had met its burden of showing statutory ground § 43-292(2) as to Gracie and statutory grounds § 43-292(2), (8), (9), and (10)(d) as to Hope, Sam, and Xavier. Ben and Joanna appeal these findings. In relevant part, § 43-292 states:
The court may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:
. . . .
(2) The parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection;
. . . .
(8) The parent has inflicted upon the juvenile, by other than accidental means, serious bodily injury;
(9) The parent of the juvenile has subjected the juvenile to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse; or
(10) The parent has . . . (d) committed a felony assault that resulted in serious bodily injury to the juvenile or another minor child of the parent.
A review of the record demonstrates that Ben and Joanna repeatedly sought unnecessary medical attention for their children. The couple reported false symptoms and test results to medical staff, resulting in the performance of unnecessary procedures and surgeries, most particularly Sam's fundoplication surgery. In many cases, it is clear that the symptoms were false because the same behavior was not observed by medical staff and was not confirmed by testing. In addition, Ben and Joanna were convicted of felony child abuse for withholding food from Xavier's feeding tube to the point that he entered a starvation state. Joanna was videotaped repeatedly disconnecting the NG tube; in addition, both Ben and Joanna admitted to the disconnection of the feeding tube. The record shows that Sam was also in a starvation state at one point. And a G-button was placed because of parental reports that Hope did not eat.
The parents argue that medical professionals performed the now-questioned procedures and that, therefore, a medical basis to do so must have existed. But parental reports were the driving force behind most of these procedures; several medical professionals testified that in order to effectively practice medicine, one must be able to take parental reports at face value. As a result of all of these medical interventions, Hope has been diagnosed with PTSD. And though Xavier appears to be doing well, the starvation he experienced as a young, premature infant might well affect him developmentally.
*402 We conclude, based upon our de novo review of the record, that under § 43-292(2), Ben and Joanna "substantially and continuously or repeatedly neglected and refused to give . . . necessary parental care and protection" to Hope, Sam, and Xavier. Moreover, under § 43-292(2), if this condition is met as to the three older children, it is also met as to their sibling, Gracie.
In addition to § 43-292(2), the record also supports the conclusion that Ben and Joanna subjected Hope, Sam, and Xavier`to aggravated circumstances, specifically chronic abuse, under § 43-292(9). The record is replete with instances of unnecessary medical treatment undergone by Hope and Sam, as well as the repeated disconnection of Xavier's feeding tube and Ben and Joanna's failure to comply with medical advice and orders relating to Xavier's treatment, even after signing a safety plan indicating that they would do so.
The evidence supports these findings under § 43-292(2) and (9) with respect to both Ben and Joanna. Joanna was responsible for many of the false reports, but the record indicates that Ben was also involved. It is not plausible that Ben was unaware of Joanna's actions. And indeed, the record reveals that Ben was present with Joanna on many relevant occasions. Notably, Ben was present at St. Elizabeth and Children's during the admission processes leading to Sam's fundoplication, times when Joanna made several false reports to medical staff. And Ben has admitted that he was as involved with the disconnection of Xavier's feeding tube as Joanna was.
Because we have concluded that Ben and Joanna are unfit under § 43-292(2) and (9), we decline to address whether the medical abuse suffered by the children was sufficient to render Ben and Joanna unfit under any other subsection of § 43-292.

(b) Best Interests
Having concluded that the State met its burden to show the requisite statutory grounds under § 43-292, we next move to the question of whether the termination of Ben's and Joanna's parental rights is in the best interests of Hope, Sam, Xavier, and Gracie. And again, upon our de novo review of the record, we conclude that termination of those rights is in the best interests of the children.
As we have already discussed, the record in this case shows an extensive history of unnecessary medical treatment. As a result of this unnecessary treatment, the three older children are victims of factitious disorder by proxy, or Munchausen syndrome by proxy. Joanna has been diagnosed with factitious disorder, or Munchausen syndrome, as well as factitious disorder by proxy. Munchausen syndrome by proxy is the name given to factitious disorders in children produced by their parents or caregivers.[14] The American Psychiatric Association defines factitious disorder by proxy as "the deliberate production or feigning of physical or psychological signs or symptoms in another person who is under the individual's care," motivated by the perpetrator's need to assume the sick role by proxy.[15] Munchausen syndrome is distinguished from Munchausen syndrome by proxy in that the medical attention is sought for oneself.
*403 In addition to her factitious disorder and factitious disorder by proxy diagnoses, Joanna has also been diagnosed with a host of other mental illnesses. Joanna has been in treatment for various disorders, including anorexia nervosa, since she was a teenager, and she has repeatedly undergone treatment. Ben and Joanna maintain that Joanna does not currently suffer from an eating disorder, but medical testimony suggests otherwise.
Moreover, Joanna has a history of being treated, claiming to feel fine, and then returning for more treatment only a few days later. Joanna's treating physicians have indicated that she plays the sick role, as evidenced by her factitious disorder and factitious disorder by proxy diagnoses. Physicians also testified that Joanna lacked insight into her issues and illnesses.
And Ben is complicit in Joanna's actions. He denies that Joanna has any problems, notably any eating disorder, and seems resistant to treatment in any case. There is evidence that Ben, too, lacks insight into Joanna's problems, as well as into his own problems.
There was evidence from multiple medical professionals that it was in the best interests of the children that Ben's and Joanna's parental rights be terminated. Most experts believed that Ben and Joanna refused to acknowledge any problems and therefore would be resistant to any attempts to rectify their behavior. And Joanna's history of unsuccessful treatment is also an indication that further treatment would not be effective. Just one expert testified that the family could be reunited; the juvenile court found that this expert "was not very compelling in her testimony nor was she very credible." This court may consider and give weight to that conclusion.[16]
Ben and Joanna suggest that this case is controlled by this court's decision In re Interest of Shelby L.[17] On petition for further review in that case, we reversed the termination of the mother's parental rights based upon allegations that the mother had too much contact with medical professionals. But In re Interest of Shelby L. is distinguishable. In that case, there had been no diagnosis of factitious disorder or factitious disorder by proxy and even the child's doctor testified that there were medical reasons for continued medical intervention. Moreover, we concluded that the inaccurate reporting of symptoms was exaggerated and that the child's improvement in foster care was not as significant as the State, the juvenile court, and the Court of Appeals made it appear. But in this case, both Joanna and the three older children have been diagnosed with factitious disorder by proxy. The children's treating physicians were unable to find medical reasons for most of Hope's, Sam's, and Xavier's various medical issues. Finally, the conclusion that Ben and Joanna were inaccurately reporting symptoms is supported by the record. The record also supports the conclusion that the children have improved since being placed in foster care, having fewer medical visits and interventions and suffering mostly from seasonal-type illnesses and allergies.
Ben and Joanna also take issue with a portion of DeMare's opinion in which he suggests that Hope suffered from traumatic brain injury at 7 months of age and with his opinion's being based only on a record review. We have considered these contentions and find them to be without merit.
*404 Based upon our de novo review of the record, we conclude that Ben and Joanna are unfit, and it is in the best interests of the children that Ben's and Joanna's parental rights be terminated. Accordingly, we conclude that Ben's and Joanna's third assignments of error are without merit.

4. REMOVAL OF GAL
In her final assignment of error, Joanna assigns that the GAL should have been removed because he "submitted a sentencing request to the criminal court urging a maximum sentence be issued"[18] in Joanna's criminal case. Joanna complains that by asking for the maximum term of 5 years' imprisonment, the GAL's recommendation would have had the effect of terminating parental rights, because Joanna would not have had the ability to comply with a dispositional plan. Joanna cites no authority in support of this contention.
We reject Joanna's argument. There is no evidence in this record regarding the content of the GAL's alleged statements in the criminal case. During the hearing on the motion to disqualify the GAL, neither Joanna nor Ben attempted to offer the content of that statement, or any evidence at all, in support of the request to have the GAL removed, save a request that the court take judicial notice of the argument made at an earlier hearing held on June 17, 2008. And the record includes neither a bill of exceptions nor a request for a bill of exceptions for that hearing.
It is incumbent upon the appellant (or in this case, cross-appellant) to present a record supporting the errors assigned; absent such a record, an appellate court will affirm the lower court's decision regarding those errors.[19] This court cannot conclude that the GAL should be removed based solely upon Joanna's assertions without any evidentiary support for such assertions. Because Joanna has failed to present any evidence as to the content of any information that might have been given to the Douglas County District Court, the record is inadequate for us to further examine Joanna's assignment of error.
We accordingly conclude that Joanna's final assignment of error is without merit.

VI. CONCLUSION
For the reasons stated, we conclude that the decision of the juvenile court terminating Ben's and Joanna's parental rights should be affirmed.
AFFIRMED.
NOTES
[1] In re Interest of Angelica L. & Daniel L., 277 Neb. 984, 767 N.W.2d 74 (2009).
[2] Id.
[3] See Hauptman, O'Brien v. Turco, 277 Neb. 604, 764 N.W.2d 393 (2009).
[4] In re Interest of Kassara M., 258 Neb. 90, 601 N.W.2d 917 (1999).
[5] In re Interest of Ty M. & Devon M., 265 Neb. 150, 655 N.W.2d 672 (2003).
[6] In re Interest of DeWayne G. & Devon G., 263 Neb. 43, 638 N.W.2d 510 (2002).
[7] Id. at 53-54, 638 N.W.2d at 519.
[8] In re Interest of Angelica L. & Daniel L., supra note 1.
[9] Id.
[10] Id.
[11] Id.
[12] See id.
[13] See In re Interest of Xavier H., 274 Neb. 331, 740 N.W.2d 13 (2007).
[14] See In re Interest of Shelby L., 270 Neb. 150, 699 N.W.2d 392 (2005), citing 2 Gale Encyclopedia of Medicine 1147 (Donna Olendorf et al. eds., 1999).
[15] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 781 (4th rev. ed.2000).
[16] See In re Interest of Angelica L. & Daniel L., supra note 1.
[17] In re Interest of Shelby L., supra note 14.
[18] Brief for appellee on cross-appeal at 41.
[19] Parker v. State ex rel. Bruning, 276 Neb. 359, 753 N.W.2d 843 (2008).