IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF JEWEL J.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JEWEL J., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
RONNIE JO B., APPELLANT.

Filed January 21, 2014.    No. A-13-517.

Appeal from the Separate Juvenile Court of Douglas County: DOUGLAS F. JOHNSON, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Joy M. Suder for appellant.

Donald W. Kleine, Douglas County Attorney, and Amy Schuchman for appellee.

INBODY, Chief Judge, and PIRTLE and RIEDMANN, Judges.

RIEDMANN, Judge.

### INTRODUCTION

Ronnie Jo B. appeals from the order of the separate juvenile court of Douglas County terminating her parental rights to her minor child, Jewel J. Ronnie Jo asserts that the juvenile court erred in finding that statutory grounds for termination were proved by clear and convincing evidence, that reasonable efforts failed to correct the conditions leading to Jewel's adjudication, and that termination was in Jewel's best interests. Finding no merit to Ronnie Jo's assignments of error, we affirm.

### BACKGROUND

Ronnie Jo is the mother of Jewel, born in December 2012. On January 23, 2013, the State filed a petition alleging that Jewel was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) and seeking termination of Ronnie Jo's parental rights to Jewel.

- 1 -

The petition alleged that Ronnie Jo's parental rights to two of her other children had been involuntarily terminated and that therefore reasonable efforts to preserve and reunify the family were not required. The petition further alleged that Ronnie Jo had substantially and continuously or repeatedly neglected to provide Jewel necessary parental care and protection and that termination of Ronnie Jo's parental rights was in Jewel's best interests. A hearing on the petition to terminate Ronnie Jo's parental rights was held on May 13 and 16.

Jewel is Ronnie Jo's fifth child to be removed from her care. Her first child, Danny S., was born in August 2007 and removed from her that month after staff at the group home where Ronnie Jo was residing expressed concerns about her parenting. According to staff members, Ronnie Jo was verbally abusive to the newborn, including using profane and inappropriate language toward him; she expressed extreme frustration with meeting Danny's needs; she refused advice designed to assist her in meeting his needs; she handled Danny roughly; and she failed to cooperate with the group home setting. During Danny's juvenile case, Ronnie Jo was ordered to complete individual therapy, anger management classes, and intensive outpatient substance abuse treatment and ordered to abstain from the use of all controlled substances except those prescribed by a doctor.

Juvenile court orders from November 2008 and February 2009 indicated that returning legal custody of Danny to Ronnie Jo would be contrary to the welfare of the child due to Ronnie Jo's failure to participate in court-ordered services, demonstrate stability, or prove that she could establish and maintain a safe and stable home and legal means of support for herself and Danny. The State filed a motion to terminate Ronnie Jo's parental rights in March 2009; however, in July 2009, Ronnie Jo voluntarily relinquished her rights to Danny.

During the pendency of Danny's case, Ronnie Jo gave birth to a second child, Zachary W., in December 2008. Zachary was removed from Ronnie Jo's care the day after he was born because Ronnie Jo had failed to correct the conditions that led to the removal of Danny. In an affidavit in support of Zachary's removal, a care coordinator from the Nebraska Department of Health and Human Services (DHHS) stated that services had been offered to Ronnie Jo in Danny's case, including supervised visitation, family therapy, individual therapy, parenting education, drug and alcohol testing and treatment, family support services, Medicaid, psychiatric services, and transportation services. However, Ronnie Jo had not fully cooperated with the services arranged by DHHS, was often inconsistent with visitation, failed to maintain stable housing or find employment, and had not completed substance abuse treatment or anger management classes. The affidavit also noted that Ronnie Jo had a lengthy criminal history, including shoplifting, failure to appear, and assault, and that her numerous incarcerations resulted in missed visitation with Danny.

In Zachary's case, Ronnie Jo was again ordered to attend individual therapy, complete anger management classes, and maintain employment. She was also ordered to cooperate with the recommendations of her drug and alcohol evaluation, which included completing intensive outpatient substance abuse treatment and abstaining from use of controlled substances, submitting to random drug testing, residing in a safe and sober environment, obtaining a sponsor and maintaining weekly contact with the sponsor, and attending two Alcoholics Anonymous (AA) and/or Narcotics Anonymous meetings per week.

In a May 2011 order, the juvenile court found that Ronnie Jo had not corrected the conditions leading to Zachary's adjudication, she had not participated in court-ordered services, and she had not had any contact with Zachary for a significant period of time. In fact, Ronnie Jo had no contact with Zachary or DHHS with respect to Zachary's case after May 2009. Because Zachary was successfully reunited with his father, DHHS and the juvenile court closed the case with respect to Ronnie Jo.

During the pendency of Zachary's case, Ronnie Jo gave birth to a third child, Jazphire B., in February 2010. As was the case with Zachary, Jazphire was also removed from Ronnie Jo the day following her birth due to Ronnie Jo's history. In the affidavit supporting Jazphire's removal, the DHHS caseworker stated that Ronnie Jo had previously been ordered by the court to participate in numerous services, but she had not regularly participated in or completed any of them. The caseworker noted that all of the services had been arranged for Ronnie Jo, but that she refused to participate.

In July 2010, the juvenile court terminated Ronnie Jo's parental rights to Jazphire under Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2012) due to Ronnie Jo's lack of progress and effort. The court found that Ronnie Jo had been repeatedly offered services, including intensive outpatient treatment, urinalysis testing, AA and sober supports, supervised visitation, anger management, counseling, parenting education, and individual therapy. Additionally, Ronnie Jo had been ordered to abstain from using alcohol and/or drugs, attend GED classes, and obtain employment. Despite DHHS' arranging supervised visitation, Ronnie Jo had minimal contact with Jazphire. Ultimately, the court found that the issues that placed Jazphire into the State's custody were the same issues that resulted in the removal of Danny and Zachary and that Ronnie Jo had failed to make any therapeutic progress.

Ronnie Jo gave birth to her fourth child, Mason B., in August 2011. Mason was "born drug-exposed and with drugs in his system." He was initially allowed to remain with Ronnie Jo, because the homeless shelter where they were residing at the time was providing services for the family and indicated that it would continue to do so.

Despite this, Mason was ultimately removed from Ronnie Jo in October 2011 after his second hospitalization for failure to thrive. Mason gained weight when he was hospitalized the first time but lost weight when released to Ronnie Jo's care. In addition, Ronnie Jo had no telephone by which she could be contacted, she had no stable residence, and she missed multiple doctor visits for Mason.

Ronnie Jo was offered numerous services during Mason's case, but she essentially disappeared during the majority of the case. She had only one visit with Mason after he was removed from her care. The family permanency specialist had no contact with Ronnie Jo from March through September 2012. The State filed an amended petition with respect to Mason in December 2011, but was never able to locate Ronnie Jo to personally serve her. In June 2012, the juvenile court granted a motion for service by publication, noting that the whereabouts of Ronnie Jo were unknown and that DHHS had not been able to ascertain her whereabouts after a reasonable search. Ronnie Jo did not appear at juvenile court hearings in August, September, or October 2012.

As a result, in October 2012, the juvenile court terminated Ronnie Jo's parental rights to Mason. The court found that Mason was a child within the meaning of § 43-292(2) and that

Mason lacked proper care through Ronnie Jo due to her "long standing failure to follow through with services and inability to provide for her prior children as well as the lack of proper parental care" of Mason.

Two months later, Jewel was born. The above-detailed history of Ronnie Jo's involvement with DHHS and the juvenile court provided the basis for removal of Jewel shortly after her birth. Molly Krejci was the DHHS child and family services specialist who removed Jewel from Ronnie Jo's care. She testified at the termination hearing that she made contact with Ronnie Jo and Jewel in January 2013. At the time, Ronnie Jo was unemployed and living with her boyfriend, Brendon J., and his mother. When Krejci went to the residence, Ronnie Jo had appropriate food, clothing, and supplies for Jewel and there were no safety concerns. Based on Ronnie Jo's history and lack of followthrough with services offered to her in previous cases, however, Krejci believed that Jewel was at risk for harm if she remained in Ronnie Jo's care.

On January 30, 2013, Ronnie Jo underwent a chemical dependency evaluation and mental health assessment. She was diagnosed with adjustment disorder with mixed mood and was found to have a high probability of substance abuse or substance dependence. Kris Siemer, the therapist who performed the evaluation, recommended that Ronnie Jo begin dual mental health treatment and substance abuse treatment. She also recommended that Ronnie Jo collaborate with her therapist to obtain a psychiatric evaluation in order to obtain a more thorough mental health diagnosis and possible medication management. Finally, Siemer recommended that Ronnie Jo collaborate with the therapist regarding substance treatment, increase her positive sober support system and attend women's only AA meetings or something similar, abstain from all substances unless prescribed, and participate in random drug and alcohol screens. Siemer reported that Ronnie Jo's alcohol and marijuana dependence was in full remission, but that this conclusion was based solely on Ronnie Jo's own indication she had stopped all substance use.

Siemer and Janece Potter, the family permanency specialist assigned to Ronnie Jo, both made referrals for Ronnie Jo to begin treatment. Despite the recommendations and referrals, Ronnie Jo never participated in any substance abuse or mental health treatment. Potter also provided Ronnie Jo with a list of women's only AA meetings and offered her bus passes to get to the meetings, but Ronnie Jo declined, stating that she did not feel it was necessary to go to the meetings. In addition, Potter referred Ronnie Jo to several organizations that provide parenting classes, but Ronnie Jo never went to any. According to Potter, Ronnie Jo did not feel that she needed the classes, and "it was one more thing to fit into her schedule."

Jewel suffers from two medical issues. She has been diagnosed with "neurofibromatosis type 1," a condition that causes benign tumors to grow in the brain, in the kidneys, in the heart, on the skin, and sometimes on the joints. This condition places Jewel at high risk for hyperactivity, high blood pressure, and tumors that may require some intervention. Jewel will also need yearly hearing and vision tests because the condition can cause blindness or deafness over time.

The most serious effects of this condition, however, are its impact on cognitive abilities. Dr. Bruce Buehler, head of genetics at the University of Nebraska Medical Center and the physician who diagnosed Jewel, testified at the termination hearing. According to Dr. Buehler, Jewel will almost undoubtedly develop learning disabilities or moderate intellectual disabilities as a result of this disorder. In his opinion, it is therefore critical that Jewel be raised in a

consistent home because a child with learning disabilities and attention deficit disorders which are high can only respond to consistency. According to Dr. Buehler, children with neurofibromatosis "need external clues" instead of being able to use their instincts to know what behavior is appropriate, so structure and routine are important in aiding the child to know what to do and what not to do.

Neurofibromatosis is a genetic disorder, and Ronnie Jo suffers from it as well. According to Dr. Buehler, Ronnie Jo's own condition appeared to cause her to have some difficulties in understanding all of Jewel's issues.

Jewel has also been diagnosed with "torticollis," a condition causing abnormal tightening or weakening in the neck or shoulder muscles that can cause the head to tilt and turn and decreases the neck and shoulder range of motion. Jewel goes to weekly physical therapy treatments, and her foster mother does exercises with her at home at least once a day to help strengthen and relax the neck and shoulder muscles. Failing to perform the exercises on a daily basis could result in tightening of Jewel's neck muscles, causing her head to tilt in one direction which could lead to balance or perceptual problems. If the condition was to get very severe, it could cause flattening of one side of Jewel's head, leading to cranial or facial deformations and growth and development problems. Therefore, performing the daily physical therapy exercises is critical to ensuring that Jewel's condition does not worsen and cause more severe problems.

Ronnie Jo attended 8 of Jewel's 11 physical therapy appointments. However, during the approximately 75 visits Sherry Anderson supervised between Ronnie Jo and Jewel, Anderson observed Ronnie Jo performing the physical therapy exercises with Jewel only twice. Anderson had concerns about Ronnie Jo's doing the exercises because "there was a lot more that the therapist showed [her] that needed to be done that was not done." Anderson was also concerned about the way the exercises were done because Ronnie Jo used "jerking" movements instead of moving slowly and gradually.

Anderson expressed additional concerns about Ronnie Jo's parenting of Jewel. She noticed that Ronnie Jo would become frustrated when Jewel would cry, and Anderson had to step in and help Ronnie Jo think of ways to help settle Jewel down. According to Anderson, Ronnie Jo would tell Jewel to stop crying and assume that Jewel understood what she was saying. Ronnie Jo would also make inappropriate comments when Jewel would cry, such as "knock it off," referring to Jewel's cries as "nonsense," and telling Jewel, "[y]ou're not going to do this to me today." Anderson said that Ronnie Jo also relied too heavily on the use of a pacifier to soothe Jewel, even when it was evident that Jewel did not want one.

Anderson also expressed concerns that Ronnie Jo played too aggressively with Jewel. Anderson noted that Ronnie Jo would rapidly move Jewel's legs as if she was quickly bicycling and that on one occasion, Ronnie Jo sat 4-month-old Jewel on her knee and began bouncing her around. Ronnie Jo would also engage in loud sounds, which often scared Jewel or made her cry.

Because of Jewel's higher needs and medical issues, Ronnie Jo was offered the service of a "home visit program." This program is a collaborative service that would provide a nurse and family support worker to go to the home while Jewel is present to help Ronnie Jo understand Jewel's medical and developmental needs, as well as assisting with any other services that the family might need. DHHS offered this service to Ronnie Jo in April 2013, but she declined because she did not feel that she needed it.

Potter began working with Ronnie Jo as the family permanency specialist in September 2012. Potter opined that Jewel would be at risk for harm if she was returned to Ronnie Jo because of Ronnie Jo's history of involvement in previous juvenile cases, her failure to reunify with her other children, and the concerns expressed in Anderson's visitation reports. Potter's opinion was also based on Ronnie Jo's longstanding history of alcohol and/or drug issues, her failure to obtain appropriate treatment and sober supports, and her failure to improve her parenting skills through a structured program.

Potter acknowledged that during this case, Ronnie Jo had stable housing with Brendon and his mother, had appropriate supplies for Jewel, and had secured employment. Potter also recognized that Ronnie Jo did participate in some services, including supervised visitation, a pretreatment and chemical dependency evaluation, a "safe start" assessment, relinquishment counseling and mediation, and urinalysis testing. However, Ronnie Jo never followed through on any of the recommendations from her evaluations, and this lack of followthrough concerned Potter because it did not appear that Ronnie Jo accepted responsibility or made progress on the reasons that her previous children had been removed. Potter testified that Ronnie Jo had not addressed the issues she needed to address, namely her substance abuse and mental health issues. Accordingly, it was Potter's opinion that terminating Ronnie Jo's parental rights would be in Jewel's best interests.

In an order dated May 17, 2013, the juvenile court terminated Ronnie Jo's parental rights to Jewel. Overall, the court found that although Ronnie Jo showed more interest in Jewel than she had in her other children, she still had not complied with court-ordered services fully enough for reunification to occur. In the juvenile court's opinion, the "clear history of inadequate parenting" was predictive for the future in terms of Ronnie Jo's inability to properly care for Jewel. Therefore, the court found by clear and convincing evidence that Jewel was a child within the meaning of § 43-247(3)(a), that § 43-292(2) was sufficiently proved, and that it was in Jewel's best interests that Ronnie Jo's parental rights be terminated. This timely appeal followed.

## ASSIGNMENTS OF ERROR

Ronnie Jo asserts that the juvenile court erred in finding (1) sufficient evidence to support termination of her parental rights to Jewel under § 43-292(2), (2) that reasonable efforts failed to correct the conditions leading to adjudication, and (3) that terminating Ronnie Jo's parental rights was in Jewel's best interests. We note that Ronnie Jo does not present arguments in support of her first two assignments of error. In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009).

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jorge O.*, 280 Neb. 411, 786 N.W.2d 343 (2010).

Although an appellate court considers only those errors assigned and discussed in the briefs, the appellate court may, at its option, notice plain error. *Connelly v. City of Omaha*, 284 Neb. 131, 816 N.W.2d 742 (2012). Plain error is plainly evident from the record and of such a

nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Id*.

## ANALYSIS

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Ronnie Jo's parental rights to Jewel, the juvenile court found that the State proved grounds for termination under § 43-292(2). Under this subsection, grounds for termination exist when the parent has "substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." Thus, the State was required to prove that Ronnie Jo neglected Jewel or a sibling of Jewel's. We have reviewed the record for plain error with respect to the juvenile court's conclusion and found none.

The uncontroverted evidence presented at trial establishes that Ronnie Jo's parental rights to Jazphire and Mason were terminated by reason of neglect. According to the juvenile court's order terminating Ronnie Jo's parental rights to Jazphire, the evidence showed that Ronnie Jo had been repeatedly offered numerous services, but that she failed to make any therapeutic progress and only had minimal contact with Jazphire, who was only 5 months old at the time of termination. The court noted that the issues that placed Jazphire into protective custody were the same issues that resulted in the removal of Danny and Zachary. As a result, the juvenile court found that Jazphire was a child within the meaning of § 43-292(2) and that terminating Ronnie Jo's parental rights was in Jazphire's best interests.

Similarly, Ronnie Jo's fourth child, Mason, was found to come within the meaning of § 43-292(2) due to Ronnie Jo's "long standing failure to follow through with services and inability to provide for her prior children as well as the lack of proper parental care" of Mason. Consequently, the juvenile court terminated Ronnie Jo's parental rights to Mason.

The foregoing evidence establishes that Ronnie Jo neglected siblings of Jewel in the past. Therefore, termination of Ronnie Jo's parental rights to Jewel under § 43-292(2) was proper.

*Reasonable Efforts.*

Ronnie Jo also assigns that the juvenile court erred in finding that reasonable efforts failed to correct the conditions leading to adjudication of Jewel. As stated above, Ronnie Jo does not argue this assigned error; however, having reviewed the record for plain error, we find none.

At the outset, we note that in its May 17, 2013, order, the juvenile court did not specifically make this finding. We note, however, that reasonable efforts to preserve and reunify the family are not required if a court of competent jurisdiction has determined that the parental rights of the parent to a sibling of the juvenile have been terminated involuntarily. Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2012). Since Ronnie Jo's parental rights had been involuntarily terminated as to Jewel's siblings, the State was not required to provide reasonable efforts to reunify Ronnie Jo and Jewel.

*Best Interests.*

Ronnie Jo argues that the juvenile court erred in finding that terminating her parental rights was in Jewel's best interests. Section 43-292 requires that parental rights can be terminated only when the court finds that termination is in the child's best interests. A juvenile's best interests are a primary consideration in determining whether parental rights should be terminated. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). In deciding best interests, the court is obligated to review the evidence presented by all parties relative to the parent's current circumstances and determine if termination of parental rights is in the best interests of the minor child based on those circumstances. *Id.*

We recognize that Ronnie Jo has made some improvements in the stability of her life during the duration of this case. Notably, she is now married to Brendon and living with him and his mother and has secured some periodic employment. In addition, Ronnie Jo was consistent in her visitation with Jewel and had all the necessary baby supplies at her home.

However, Ronnie Jo has failed to address issues that have been a concern since her first child was removed from her care. In every case involving Ronnie Jo's children, she has been offered services, and in some cases ordered by the court to complete certain services, but failed to utilize those services. She has yet to complete substance abuse treatment, individual therapy, or anger management classes. Ronnie Jo declined to attend parenting classes, indicating that she did not need them and that it was an inconvenience. Furthermore, Ronnie Jo refused the services of the "home visit program," even though Jewel is a high needs child and it was thought that Ronnie Jo could benefit from the program which would assist her in dealing with such a child. The evidence also suggests that Ronnie Jo continues to be too aggressive with Jewel and speaks to her in an inappropriate manner, the same concerns that led to the removal of Danny in 2007.

Perhaps most compelling in the analysis of Jewel's best interests is Dr. Buehler's testimony, stressing the importance that Jewel be raised in a consistent home due to the near certain likelihood that she will develop intellectual disabilities. Dr. Buehler indicated that Ronnie Jo's own neurofibromatosis appeared to cause her some difficulties in understanding all of Jewel's issues, which does not bode well for the parent of a child with special needs, or a "high risk child," as Dr. Buehler described Jewel. Dr. Buehler also noted that Brendon "seems to be delayed" and "probably is going to have a difficult time functioning as a father," meaning that he would be unable to provide much parenting assistance to Ronnie Jo.

The best interests of the child require termination of parental rights where a parent is unable or unwilling to rehabilitate themselves within a reasonable time. *In re Interest of Emerald C. et al.*, 19 Neb. App. 608, 810 N.W.2d 750 (2012). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.*

Although Ronnie Jo has made some improvements in her personal life, she has yet to address any of the concerns regarding her parenting. Moreover, she does not appear to recognize her need to address these issues or the impact they have on her ability to parent, particularly her ability to parent a young child who has high needs of her own. We agree with the juvenile court's observation that although Ronnie Jo has shown more effort with respect to Jewel than she has in the past, she has not made sufficient improvement or indicated a willingness to do so in order for Jewel to be safely returned to her care. All children need consistency, stability, and permanency, but this is particularly true for Jewel. This does not appear to be possible with

Ronnie Jo. The evidence is clear that it is in Jewel's best interests that Ronnie Jo's parental rights be terminated.

*Denial of Fundamental Right.*

Ronnie Jo argues, but does not assign, that the State's action of removing Jewel from her care based solely on the fact that her parental rights to other children had been terminated denied Ronnie Jo the fundamental right to be a parent to Jewel. Having not been assigned as error, we review this issue for plain error and find none.

## CONCLUSION

The juvenile court did not err in terminating Ronnie Jo's parental rights to Jewel.

AFFIRMED.