Lori Jean Logan, appellee, v.
Terry Lee Logan, appellant.
___ N.W.2d ___

Filed January 20, 2015.    No. A-13-1038.

1. **Divorce: Property Division: Alimony: Appeal and Error.** An appellate court's review in an action for dissolution of marriage is de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding division of property and support.

2. **Judgments: Words and Phrases.** An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

3. **Divorce: Appeal and Error.** While in a divorce action the case is reviewed on appeal de novo, the appellate court will give weight to the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of the facts rather than the opposite.

4. ____: ____. Obviously, a trial court weighs the credibility of the witnesses and the evidence and determines what evidence should be given the greater weight in arriving at a factual determination on the merits. The testimony need not be accepted in its entirety and the trier of fact must use a commonsense approach and apply that common knowledge which is understood in the community.

5. **Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2008), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

6. ____. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case.

7. **Records: Appeal and Error.** It is incumbent upon the appellant to present a record supporting the errors assigned; absent such a record, an appellate court will affirm the lower court's decision regarding those errors.

8. **Rules of the Supreme Court: Appeal and Error.** The Nebraska Supreme Court has repeatedly emphasized that Neb. Ct. R. App. P. § 2-109(D)(1) (rev. 2014) requires a party to set forth assignments of error in a separate section of the brief, with an appropriate heading, following the statement of the case and preceding the propositions of law, and to include in the assignments of error section a separate and concise statement of each error the party contends was made by the trial court.

9. ____: ____. Headings in the argument section of a brief do not satisfy the requirements of Neb. Ct. R. App. P. § 2-109(D)(1) (rev. 2014).

10. ____: ____. When a party on appeal fails to comply with the clear requirements of the court rules mandating that assignments of error be set forth in a separate section of the brief, an appellate court may proceed as though the party failed to file a brief or, alternatively, may examine the proceedings for plain error.

11.  **Appeal and Error.** Plain error is error plainly evident from the record and of
     such a nature that to leave it uncorrected would result in damage to the integrity,
     reputation, or fairness of the judicial process.

Appeal from the District Court for Dakota County: Paul J. Vaughan, Judge. Affirmed.

Craig H. Lane, P.C., for appellant.

Michele M. Lewon, of Kollars & Lewon, P.L.C., for appellee.

Moore, Chief Judge, and Irwin and Pirtle, Judges.

Irwin, Judge.

## I. INTRODUCTION

Terry Lee Logan appeals an order of the district court for Dakota County, Nebraska, in which order the court dissolved Terry's marriage to Lori Jean Logan, divided marital assets, and ordered each party to pay his or her respective attorney fees. On appeal, Terry challenges the court's valuation of the marital home and a family business, the court's division of other property and debt, and the court's allowance of temporary alimony to the date of the decree. We find no merit to the appeal, and we affirm.

## II. BACKGROUND

The parties were married in 1973. During the course of their marriage, they had three children, all of whom are now adults. At the time of trial, Terry was 61 years of age and Lori was 57 years of age.

In August 2012, Lori filed a complaint seeking dissolution of the parties' marriage. In her complaint, Lori requested an award of temporary and permanent spousal support, an equitable division of marital assets and debts, and attorney fees. In October 2013, the district court entered a decree dissolving the parties' marriage and dividing the parties' assets and debts. Terry has appealed from the decree, and Lori has purported to bring a cross-appeal.

The primary issues raised by Terry in his appeal concern the valuation of the parties' marital home, the valuation of a

business operated by Terry, the division of other property and debt, and an award of temporary alimony during the proceedings below.

## 1. Marital Residence

Terry and Lori purchased the marital residence in 1998. Lori moved out of the residence in August 2012, and Terry was still residing there at the time of trial. Both parties testified that they wanted to be awarded the marital residence.

Terry testified that he believed that the marital residence was worth $185,000. Lori testified that she believed that the marital residence was worth $198,000. In addition, a real estate broker opined that the marital residence was worth between $193,000 and $203,000.

The primary issue on appeal concerning the valuation of the marital residence relates to indebtedness of two of the parties' sons and how that indebtedness relates to the marital residence. The evidence adduced at trial indicated that the remaining amount of the primary mortgage on the marital residence was approximately $3,353.

In Lori's motion for temporary allowances, she alleged that both sons had loans secured with the parties' home as collateral. Similarly, in his affidavit objecting to temporary allowances, Terry averred that the marital residence was "subject to second mortgages representing additional collateral for two (2) of the parties' sons who could not otherwise purchase homes." In that affidavit, Terry further opined that "to his recollection, one (1) mortgage was $75,000 and the other mortgage was $80,000."

At trial, Lori provided exhibits reflecting the two sons' indebtedness to a credit union. She testified that the parties had allowed the two sons to use the marital residence as collateral for loans. At trial, Lori did not want the valuation of the marital residence reduced by the value of the sons' loans, although she agreed that the loans created liens on the residence.

At trial, Terry presented a proposed distribution of assets and liabilities, in which he proposed that the court reduce the value of the marital residence by the primary mortgage

amount and also by the amount of each of the two sons' loans for which the residence was serving as collateral.

In the decree, the district court valued the marital residence at $185,000, which was Terry's proposed value, and awarded the residence to Lori, subject to indebtedness. The court reduced the value of the residence by the amount of the primary mortgage and also by the amount of each of the two sons' loans. The court specifically noted in the decree that both Terry and Lori "argued at trial that these are legitimate deductions to the equity value of the home notwithstanding the fact that the sons have, and likely will, continue to pay their respective mortgages. Since both parties have argued this position, the Court has adopted their positions."

### 2. Terry's Business

Terry was employed at a meatpacking company for 22 years, and then at a computer company for 15 years. He operated an individual tax preparation service on a part-time basis while employed at the computer company. When he lost his job at the computer company in 2008, he began operating his tax service on a full-time basis. Terry testified that his tax service primarily involves completion of individual tax returns, earning him approximately $50 per return.

The tax service had been operated as a limited liability company prior to the parties' separation. After the parties' separation, Terry dissolved the limited liability company. Terry testified that he dissolved the limited liability company because Lori had sought and received a protection order which made it impossible for him to continue operating the business in a business relationship with Lori. Terry testified that the dissolution resulted in his having to move the location of the business and incur costs.

Terry estimated that he services between 900 and 1,000 clients through the business. He testified that he has "20 to 25" bookkeeping clients. He testified that he receives between $150 and $200 per month per bookkeeping client and that he averages approximately $50 per return for tax preparation services.

Terry testified that during the first 5 months of 2013, the business had generated over $73,000 in income; this amount was also presented in an exhibit offered by Terry. Terry estimated that bookkeeping revenue for the remainder of 2013 would be between $20,000 and $24,000.

Terry presented expert testimony concerning the valuation of the business from a partner in a certified public accounting firm. Terry's expert indicated that he had provided approximately a dozen business valuations in the past 20 years, and he provided a report which was offered and received by the court. Terry's expert based his opinion of the business' value on a valuation report prepared by another accountant, who had opined that the value of the business was between $52,000 and $70,000. Terry's expert testified that he felt the range was reasonable, and he opined that the business was worth between $0 and $70,000. Terry's expert based his opinion, in part, on the fact that the business was one providing tax and bookkeeping services, not accounting, and the fact that the business' customers were those looking for cheap services from year to year, rather than reliable repeat customers. Terry's expert also testified, however, that if Terry sold the business and did not "stick around and assist with the transition to . . . new owners," then the value of the business was potentially "very possibly zero up to, perhaps, the value of the furniture and equipment," and that it was possible someone would offer Terry only between "$500 or $1,000" for his client list. Terry's expert also testified that he "assumed that [Terry] would try to minimize the value of his business if he were going through a divorce."

Lori also presented expert testimony concerning the valuation of the business from a certified public accountant. Lori's expert testified that he was in the process of becoming accredited in business valuations and that he had valued nine businesses as a certified public accountant in the previous year. Lori's expert opined that the business was worth approximately $66,000 as of December 31, 2011. Lori's expert testified that his valuation was hampered because his access to information concerning the business was "very, very, very

much restricted to the revenues . . . of the company." As a result, he reduced his opinion to a "calculation report" instead of a "valuation report." He testified that his calculation was also consistent with his opinion of the business' value based on his familiarity with small tax and bookkeeping practices in the area.

In the decree, the court awarded the business to Terry and set its value at "a value of $25,000." The court noted that the value was "substantially lower than the value of [Lori's] expert at $66,000, but more than [Terry's] expert at $19,000." The court indicated that it had determined the value of the business "by a full consideration of all factors considered by both parties' expert witnesses."

### 3. OTHER PROPERTY AND DEBT

In the decree, the district court divided other property and debt of the parties. In particular, the court made specific findings about "certain disputed items."

The court valued an "Ameriprise account" and made a division of it. The court concluded that the account had a value of $44,832.04 at the time of separation, that it had been reduced to $22,521.59 by the time of trial, and that Terry had been in control of the account during that time and had spent the $22,310.45 from the account for living expenses. The court awarded each party $11,260.80, reflecting half of the remaining balance of the account, but assessed Terry $33,571.24 in the marital estate to reflect both his half of the account and the amount by which he had diminished the account's balance prior to trial.

The court ordered Lori to pay $13,782.94 on a debt owed to "GM Mastercard." The court included this amount as a marital debt for which Lori was responsible. The court also ordered Lori to pay a $10,060.05 debt to Pioneer Bank. The court included this debt as a marital debt for which Lori was responsible. Similarly, the court also ordered Lori to pay debts of $877.23 to "Everett's Furniture," $885.29 to "Younker's Credit Card," $740.20 to "Siouxland Paramedics Bill," and $1,772.31 to "Mercy Medical Center Bill," and concluded each were marital debts for which Lori was responsible.

### 4. Temporary Alimony

In March 2013, Lori filed a motion for temporary allowances, in which, among other requests, she requested the court order temporary alimony to commence then "and continue each and every month thereafter until final disposition of the case." Terry filed an affidavit, in which he averred that the request for temporary allowances should be denied. In April, the court entered an order awarding Lori temporary alimony commencing March 1, 2013, and continuing "until conclusion of this matter."

In the decree, the court noted that Terry had been ordered to pay temporary spousal support "commencing March 1, 2013, until conclusion of this matter." The court held that "[t]emporary support shall terminate upon entry of this Decree" and that "[n]o further spousal support shall be ordered."

## III. ASSIGNMENTS OF ERROR

On appeal, Terry has assigned four errors: First, he asserts that the district court erred in reducing the value of the marital home by the two sons' loans, which were secured by the marital home. Second, he asserts that the court erred in its valuation of the business. Third, he asserts that the court erred in its division of other property and debts. Fourth, he asserts that the court erred in granting Lori temporary alimony from July 2013 through the date of the filing of the dissolution decree.

On her purported cross-appeal, Lori has not assigned any errors, but has presented arguments concerning the district court's valuation of the business and failure to award Lori attorney fees.

## IV. ANALYSIS

### 1. Terry's Appeal

[1,2] An appellate court's review in an action for dissolution of marriage is de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Pohlmann v. Pohlmann*, 20 Neb. App. 290, 824 N.W.2d 63 (2012). This standard of review applies to the trial court's determinations regarding division of property and support. See

*id*. An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

(a) Valuation of Marital Residence

Terry first challenges the district court's valuation of the marital residence. Specifically, Terry assigns as error the court's determination to reduce the value of the marital residence by the outstanding balances on the two loans taken out by the parties' sons and secured through the use of the marital residence as collateral. We find no abuse of discretion.

Terry's arguments on appeal do not challenge the court's determination as to the valuation of the marital residence or the court's inclusion of the remaining balance of the primary mortgage on the residence. Terry also does not challenge the specific amounts the court determined to be the outstanding balances on the two sons' loans for which the marital residence was serving as collateral. Terry's argument is limited to challenging the court's determination that the value of the marital residence be reduced by the balances on the two loans, because the sons were paying their loans and because the end result is "inequitabl[e]." Brief for appellant at 23.

Terry acknowledges in his brief that "[t]here seemed to be some confusion and conflicting testimony regarding whether" the two sons' loans reflected indebtedness on the marital residence. Brief for appellant at 21. The record indicates that both parties asserted at trial that the two sons' loans were indebtedness against the value of the marital residence. As noted above in the "Background" section, Lori first noted that the residence was serving as collateral for the two sons' loans in her motion for temporary allowances, and in his response thereto, Terry specifically indicated that the residence was "subject to second mortgages representing" collateral for the two sons' loans. Both parties testified at trial that the marital residence was used as collateral for the two loans.

By the conclusion of the trial, Lori did not want the valuation of the marital residence reduced by the value of the loans, but agreed that the loans created liens against the residence.

The proposed distribution of assets and liabilities that Terry presented to the court specifically proposed that the court reduce the value of the marital residence by the primary mortgage amount and the amounts of the two sons' loans. Terry wanted the court to award him the residence and wanted the value attributed to him in the distribution of the marital estate to reflect the reality that the two loans were secured by the residence and that they reduced the equity value in the residence.

The court specifically noted that it was including the loans in the valuation of the residence because both parties had argued to the court that such should be done. Now that Terry was not awarded the residence, he attempts to assert that the court erred in valuing the residence and considering the two loans precisely as he asked the court to do at trial. There is no abuse of discretion in the court's determination, and this assignment of error is meritless.

### (b) Valuation of Business

Terry next asserts that the court erred in its valuation of his tax preparation business. He argues on appeal that the court erred in finding that the business could be valued at $25,000 or in finding any value at all, beyond the value of equipment. We find no abuse of discretion.

[3,4] In reviewing challenges to the valuation in dissolution proceedings of the interest in a business, the Nebraska Supreme Court has recognized that while in a divorce action the case is reviewed on appeal de novo, the appellate court will give weight to the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of the facts rather than the opposite. See *Lockwood v. Lockwood*, 205 Neb. 818, 290 N.W.2d 636 (1980). Obviously, a trial court weighs the credibility of the witnesses and the evidence and determines what evidence should be given the greater weight in arriving at a factual determination on the merits. *Lockwood v. Lockwood, supra*. The testimony need not be accepted in its entirety and the trier of fact must use a commonsense approach and apply that common knowledge which is understood in the community. *Id*.

In this case, Terry argues on appeal that the court erred in finding that the business had any value beyond the small value of equipment, including outdated computers and old desks. However, our review of the record indicates that both parties presented evidence that would support a finding that the business had value beyond just this equipment. Terry's own expert opined that a valuation prepared by another accountant and placing the value of the business as being between $52,000 and $70,000 was reasonable. Terry's expert opined that the business was worth between $0 and $70,000, although he testified that the business' client list was potentially worth as little as $500 to $1,000. Lori presented expert testimony suggesting the value of the business was approximately $66,000.

Terry makes arguments on appeal concerning the qualifications of Lori's expert. Lori counters by making arguments on appeal concerning the qualifications of Terry's expert. Such arguments are challenges to the credibility of the witnesses, and we do not second-guess the trial court's determinations about the credibility of witnesses.

Although we recognize that the district court's decision to value the business at $25,000 does not reflect adoption of a specific value testified to by any of the witnesses, the evidence at trial would have supported a valuation of $0 to $70,000. The parties also presented testimony about a variety of factors that might affect the valuation, positively or negatively, including the data available to make a valuation, whether the customers would be likely to continue patronizing the business if it was run by someone other than Terry, the nature of the customers, et cetera. The parties also presented evidence about a variety of valuation methods. All of these factors taken into account, we do not find the valuation of the trial court to be an abuse of discretion. This assigned error is without merit.

### (c) Other Property and Debts

Terry also asserts that the court erred in various other specific determinations of property and debt distribution. We find no abuse of discretion.

[5,6] Under Neb. Rev. Stat. § 42-365 (Reissue 2008), the equitable division of property is a three-step process. *Plog v.*

*Plog*, 20 Neb. App. 383, 824 N.W.2d 749 (2012). The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Plog v. Plog, supra*. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id*.

In this case, the division of marital assets and liabilities ended up such that Lori received a net marital estate value of $83,547.91 and Terry received a net marital estate value of $82,725. Terry has indicated that several specific items were erroneously considered by the district court in its division of the marital estate. We consider each in turn.

### (i) Pioneer Bank Debt

First, Terry asserts that the district court erred in finding that a $10,060.05 debt to Pioneer Bank, which the court ordered Lori to pay, should be considered a marital debt. Terry argues that the debt was incurred to pay Lori's attorney fees.

Terry points to Lori's testimony at trial to support his assertion that this loan was used for Lori's attorney fees. Lori testified that she took out the note at Pioneer Bank for $10,000 because she "had attorney bills to pay and [she] put it on [her] credit card and [she] went over the limit, so [she] went to the bank." She testified that "once you go over the limit, then you have to pay that over the limit amount" and that "it was $5,300 and some-odd dollars, so [she] borrowed that money from Pioneer Bank to pay part of it and to the credit card for the attorney fees and car repair."

[7] This testimony does suggest that Lori used some portion of this loan to pay attorney fees. However, it is not clear how much of it was used for attorney fees and how much was used for other expenses that would properly be considered marital debt. Lori's testimony indicates that she took out this loan because when she used a credit card to pay attorney fees, she ended up going over the limit on the credit card. She testified that she used this loan to pay "part" of the overage and to pay

the credit card "for the attorney fees and car repair." On this record, there is no way for us to determine how much of this was used to pay attorney fees and how much was used to pay other unidentified charges on the credit card. It is incumbent upon the appellant to present a record supporting the errors assigned; absent such a record, an appellate court will affirm the lower court's decision regarding those errors. *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009). In this case, Terry has not presented a record indicating how we can ascertain that the court abused its discretion in treating this loan as a marital debt simply because some unknown amount of it may have been used to pay a credit card bill that included payments for attorney fees.

### (ii) GM Mastercard

Terry next asserts that the court erred in treating debt associated with a GM Mastercard as marital without properly considering testimony that Lori used the credit card to purchase some items of furniture during the parties' separation. He points out that Lori testified that "part of this credit card debt was her purchase of various pieces of furniture including a bedroom set in the sum of $4,800 as well as two (2) other purchases at Everett's Furniture." Brief for appellant at 35.

In the decree, the court noted that Lori had valued the GM Mastercard debt at $20,809.88 and had requested the entire amount be considered a marital debt, and that Terry had valued the GM Mastercard debt at $13,776.94 and had requested the entire amount be considered a nonmarital debt. The court ordered Lori to pay the debt, but placed the marital debt value at $13,782.94. In reducing the value to this amount, the court specifically held that it was not allowing amounts attributed to "excess charges for OnStar and internet purchases of $1,137.22, concert and lodging purchases of $935.62 and furniture purchases of $4,954.10 for items [Lori] did not list as marital assets."

Terry argues that "this debt should either be viewed as non-marital or that the value of the furniture Lori purchased with this credit card should be added . . . as an asset." Brief for appellant at 35. Inasmuch as the court specifically reduced

the amount of the debt considered as marital to account for the furniture Terry is complaining about, we find no abuse of discretion.

Terry also argues that the debt should be considered non-marital because he paid temporary spousal support of $1,500 per month and that the debt could be considered an "unnecessary dissipation of assets." Brief for appellant at 36. Again, Terry has not established how or why the amount of the debt actually considered marital by the district court reflects an improper dissipation of assets or constitutes nonmarital expenses. We find no abuse of discretion in the court's treatment of this debt.

### (iii) Ameriprise Account

Terry next asserts that the district court erred in its treatment of an Ameriprise account. He argues the court erred in crediting against his interest in the account money he used for living expenses and for paying temporary spousal support and in crediting against his interest an amount that was transferred from the Ameriprise account to a Bank of the West individual retirement account.

With respect to the Ameriprise account, the district court made specific findings. The court noted that the account had a value at the time of separation of $44,832.04 and, by the time of trial, had been reduced to $22,521.59. The court noted that Terry had control of this account throughout and that he had testified he spent the amount by which the account was reduced to pay for his living expenses. As such, the court awarded each party half of the remaining balance ($11,260.80 each), but assessed $33,571.24 against Terry in the marital estate calculations.

Terry testified that he withdrew "about half" of the money in the Ameriprise account "for living expenses" after being served with Lori's complaint for dissolution. He testified that he calculated his budget "for the next four or five months and determined that [he] needed to take out about $22,000 to meet [his] home bills." He testified that he "figured [he'd] give [Lori] half and [he'd] get half. So [he] took [his] half out to live on . . . ." He also testified that money in a Bank

of the West account "came from the IRA" and that it represented an amount out of the $22,000 withdrawn from the Ameriprise account that he "didn't quite need all" and "put it back into the IRA." Terry testified that he then took the money back out of the Bank of the West account to pay Lori temporary alimony.

We do not find an abuse of discretion in the court's treatment of the amounts from the Ameriprise account. Terry's testimony supports the court's determination that Terry withdrew half of the value of the account after the separation and used it to pay living expenses and temporary alimony payments to Lori.

### (iv) Various Other Debts

Finally, Terry asserts that the district court erred in its treatment of several other debts, including a furniture bill, a Younker's credit card, and medical bills. With respect to these debts, he simply argues that it is his position that they should have been considered Lori's individual debt and not included in the marital estate, and he points out that the medical bills were incurred after the parties had separated. Terry has not demonstrated an abuse of discretion by the court with respect to any of these debts.

### (v) Conclusion

We find that Terry has not demonstrated an abuse of discretion with respect to the district court's treatment of any of these challenged debts. We find no merit to this assignment of error.

### (d) Temporary Alimony

Finally, Terry asserts that the district court erred in granting Lori temporary alimony after the time of her deposition or the trial. He argues that Lori had consistently testified since the time of a deposition in December 2012 that she was not requesting alimony, and he argues that the court should have terminated the temporary alimony award effective either at the time of her deposition or at the time of trial, rather than at the time of entry of the decree. We find this assertion to be meritless.

In his brief on appeal, Terry points this court to only three pages of the record to support his assertion on appeal. On those pages, Lori was asked, "Are you making a request to the Court today to have [Terry] pay alimony to you after this divorce is final?" Lori replied, "No." In addition, the court specifically asked Lori's counsel if she was "agreeing there's not going to be an alimony request as part of these proceedings," and Lori's counsel indicated, "Right, constantly and consistently that's been her testimony, she testified to it at her deposition in December, as well as today, and I've made several comments that have said we're not pursuing alimony." Lori's counsel indicated, "So she's making no long-term request for alimony."

Lori requested temporary and permanent spousal support in her complaint, filed in August 2012. In March 2013, Lori filed a motion for temporary allowances, including spousal support. The court entered an order directing Terry to pay temporary spousal support "until conclusion of this matter." The record presented to us does not include any indication that, after the temporary order was entered, Terry took any action in the district court to challenge or modify this temporary order.

The portions of the record that Terry has pointed us to on appeal do not, in any way, support his argument that Lori did not want temporary spousal support until the entry of the decree and that the court abused its discretion in not, sua sponte, altering its temporary order to terminate temporary spousal support earlier than the entry of the decree. Lori's testimony at trial, Lori's counsel's assertions to the court, and even the portions of Lori's deposition that Terry attached to his affidavit contesting the motion for temporary allowances, all clearly indicate that Lori was not seeking a permanent alimony award. They do not, in any way, suggest that Lori did not want the temporary spousal support that she had filed a motion specifically asking the court to award. Terry's assignment of error in this regard is meritless.

## 2. Lori's Cross-Appeal

Lori has purported to file a cross-appeal. In so doing, however, she has failed to present any assignments of error. Lori's

brief on cross-appeal does not contain any separate section setting forth assignments of error. Rather, her brief includes in headings within the "Argument" section of the brief assertions that the district court committed error concerning the valuation of the business and denial of her request for attorney fees.

[8,9] The Nebraska Supreme Court has repeatedly emphasized that Neb. Ct. R. App. P. § 2-109(D)(1) (rev. 2014) requires a party to set forth assignments of error in a separate section of the brief, with an appropriate heading, following the statement of the case and preceding the propositions of law, and to include in the assignments of error section a separate and concise statement of each error the party contends was made by the trial court. See, *In re Interest of Samantha L. & Jasmine L.*, 286 Neb. 778, 839 N.W.2d 265 (2013); *In re Interest of Jamyia M.*, 281 Neb. 964, 800 N.W.2d 259 (2011). The court has also emphasized that "headings in the argument section of a brief do not satisfy the requirements of Neb. Ct. R. App. P. § 2-109(D)(1)." *In re Interest of Samantha L. & Jasmine L.*, 286 Neb. at 783, 839 N.W.2d at 269-70. See, also, *In re Interest of Jamyia M., supra*.

[10,11] When a party on appeal fails to comply with the clear requirements of the court rules mandating that assignments of error be set forth in a separate section of the brief, we may proceed as though the party failed to file a brief or, alternatively, may examine the proceedings for plain error. *In re Interest of Samantha L. & Jasmine L., supra*; *In re Interest of Jamyia M., supra*. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Id*. After reviewing the relevant parts of the record, we find no plain error.

## V. CONCLUSION

We find no merit to Terry's assertions of error. We find that Lori failed to assign any errors on cross-appeal, and we find no plain error. We affirm.

Affirmed.