IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF BENJAMIN K.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BENJAMIN K., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JESSICA N., APPELLANT, AND KYLE K., APPELLEE.

Filed May 6, 2025.    No. A-24-631.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Kendall Krajicek for appellant.

Donald W. Kleine, Douglas County Attorney, and Anna Marx for appellee State of Nebraska.

RIEDMANN, Chief Judge, and MOORE and ARTERBURN, Judges.

RIEDMANN, Chief Judge.

INTRODUCTION

Jessica N. appeals from the order of the separate juvenile court of Douglas County terminating her parental rights to her minor child, Benjamin K. Following our de novo review, we affirm.

BACKGROUND

Jessica and Kyle K. are the biological parents of Benjamin, born in November 2015. Kyle's parental rights were also terminated during the relevant proceeding; however, he does not appeal. Kyle is therefore referenced only as necessary to determine Jessica's appeal.

- 1 -

Benjamin had been removed from Jessica's custody on two previous occasions. Benjamin was first removed in 2016, after the Department of Health and Human Services (DHHS) received an intake reporting Kyle had caused Benjamin to overdose on Benadryl. During the investigation, Jessica tested positive for methamphetamine. This case was never adjudicated, and Benjamin was reunited with Jessica after being in out-of-home care for about 6 months.

In 2019, DHHS received an intake alleging that Jessica was using methamphetamine and neglecting and physically abusing Benjamin. Jessica's home was subsequently searched and it was reported that Benjamin was "locked in a play pen with a baby gate zip tied on the top" and that methamphetamine and drug paraphernalia were found in the home. Jessica was suspected to be under the influence and Benjamin later tested positive for amphetamines and methamphetamine. He was removed from Jessica's home, and she was convicted of felony child abuse and sentenced to 5 years' probation. Benjamin was found to be within the meaning of Neb. Rev. Stat. § 43-247(13)(a) (Reissue 2016) and remained in foster care for 33 months before being returned to Jessica's custody in September 2021.

The instant case pertains to the removal of Benjamin from Jessica's care in January 2023. Between December 15 and 19, 2022, DHHS received four intakes alleging Jessica was using substances and was homeless, Benjamin's location was unknown, he was at risk because he was nonverbal and on the autism spectrum, and he was taken to the home of his previous foster parent because his grandmother could not care for him. Following these intakes, the parents agreed to a safety plan implemented by DHHS to ensure Benjamin's safety during the investigation and prevent his removal. However, on January 3, 2023, DHHS learned that Jessica had violated the safety plan, and Benjamin was removed from the parental home and placed in his previous foster home. The following day, the State filed a petition alleging Benjamin came within the meaning of § 43-247(3)(a), due to the fault or habits of Jessica.

On March 7, 2023, the State filed an amended petition seeking termination of Jessica's parental rights. Count I alleged Benjamin came within the meaning of § 43-247(3)(a) by reason of the faults or habits of Jessica, including her history of involvement with DHHS, failure to provide for Benjamin's needs, and substance use. Counts II through V alleged that statutory grounds existed to terminate Jessica's parental rights under Neb. Rev. Stat. § 43-292(2), (3), and (4) (Reissue 2016) and that termination of her parental rights was in Benjamin's best interests. Count VI alleged that reasonable efforts were not required under Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2024) because Jessica had subjected Benjamin to abandonment, torture, chronic abuse, or sexual abuse.

An adjudication hearing was held on June 2, 2023, and Jessica entered no contest pleas to certain allegations in the amended petition; specifically, that her use of controlled substances and alcohol placed Benjamin at risk for harm, she had failed to provide for his daily needs, and she had failed to follow through with the safety plan implemented by DHHS. The juvenile court adjudicated Benjamin as a child within the meaning of § 43-247(3)(a) and ordered Jessica to comply with a rehabilitation plan.

The rehabilitation plan required Jessica to obtain and maintain safe, stable, and adequate housing; obtain and maintain a stable and legal source of income; complete a monthly budget; meet with the case manager on a monthly basis; participate in supervised visitation; complete psychological and chemical dependency evaluations; submit to random drug testing; notify the

court of any services necessary to assist in reunification; follow the rehabilitation plan and make efforts to bring about rehabilitation; and notify the court, her attorney, and DHHS of changes in employment, residence, or phone number within 48 hours. The juvenile court also ordered out-of-home placement to continue and set a date for trial on the State's amended petition for termination of Jessica's parental rights.

The termination trial was held on multiple dates between September 2023 and July 2024. The State called several witnesses to testify including several DHHS caseworkers, Jessica's probation officer, Benjamin's foster mother, his doctors, his teachers and prior principal, and Kyle's mother. The court also received various exhibits, including certified copies of Benjamin's prior juvenile proceedings and Jessica's prior criminal convictions, court reports prepared by DHHS, the safety plan, and a certified copy of the instant proceeding prior to the termination trial. We note that our bill of exceptions ends with the proceedings held on April 9 and does not include the July 10 proceedings. It appears from the transcript, however, that on that date, the State rested, and the guardian ad litem, Kyle, and Jessica all rested without presentation of evidence and the matter was submitted. We therefore assume we have before us all relevant evidence.

Former DHHS child and family services specialist, Michelle Matherly, met with Jessica and Kyle in December 2022 to create a safety plan after receiving multiple intakes concerning Benjamin. She testified that, at this meeting, Jessica stated that she had attempted to contact providers of applied behavior analysis therapy (ABA), a therapy designed for children with autism. However, Jessica also admitted, that although Benjamin had previously participated in occupational therapy (OT) and speech therapy through his school, she had discontinued these therapies. A certified copy of this case was received into evidence at trial which included Matherly's affidavit for removal. The affidavit recounted these services ended in February 2022.

At this meeting, the parents agreed to the safety plan but, in January 2023, Matherly determined it had been violated. Benjamin was subsequently removed and placed in foster care.

Jessica's probation officer, Madison Romanek, was assigned in April 2021, following Jessica's child abuse conviction. She testified that Jessica's primary goal in the spring was stability; Jessica was working on maintaining her employment and housing, and generally complying with probation. Per her probation, Jessica was required to submit to random drug testing and test negative for all substances.

In April 2022, Jessica tested positive for methamphetamine, amphetamine, and ecstasy, and between April and October, Jessica had inconsistent communication, missed 13 office appointments, and failed to appear for all required drug tests. Romanek determined Jessica had absconded and filed a violation of probation. A warrant was issued for Jessica's arrest in October, and it was executed in December. Romanek described that, while Jessica was being arrested, she expressed concern over who would pick up Benjamin from school and where he would stay while she was incarcerated. Jessica was subsequently incarcerated until December 13, 2022.

Romanek met with Jessica after her release. Jessica stated that Benjamin had stayed with Kyle and Kyle's mother, Patricia K., while she was incarcerated. Benjamin appeared to be "fine," although he was taken to a separate room during the appointment and Romanek did not interact with him much. Jessica was behaving as if she was under the influence or having a mental health episode and she tested positive for alcohol.

Since Benjamin's removal in 2023, Jessica had been inconsistent with probation compliance. In January, Jessica failed another drug test. As a result, she was required to complete an updated co-occurring substance use and mental health evaluation. She completed a substance use evaluation in March, during which she reported using methamphetamine three times in the previous month. The evaluation recommended she seek level two intensive outpatient treatment. Jessica's drug tests were negative between the failed test in January and August.

Furthermore, Jessica's living situation and employment were unstable. Some of Jessica's instability was the result of her living in approximately eight different mental health and substance abuse treatment facilities during the previous year. However, according to Romanek, this much movement between treatment programs was atypical or unnecessary. Romanek was also concerned because Jessica had been unsuccessfully discharged by a sober living facility which Romanek had sanctioned her to reside in, and Romanek had never been provided information that Jessica had successfully completed a substance abuse program.

Annalisa Blankman, a special education teacher at Benjamin's elementary school, worked with him from December 2021 to May 2023. She testified that a meeting to discuss Benjamin's individualized education plan (IEP) was held in January 2022. After this meeting, it was decided that Benjamin would receive OT and speech therapy at school and have shortened school days so that he could participate in ABA in the afternoons. However, he did not participate in ABA during his time at this school.

Between August and December 2022, Blankman observed that Benjamin came to school physically dirty, often with a soiled pull-up and wearing dirty clothes that were too small. Blankman attempted to bring the issue to Jessica's attention, but Jessica responded she was doing the best she could. Benjamin did not make much progress in school during this time and was inconsistent in using his assistive communication device because it was either not sent to school or was sent uncharged. After Benjamin was removed from Jessica's care in January 2023, his hygiene improved, and he made progress in school, academically and behaviorally.

Patricia, Benjamin's paternal grandmother, testified that Benjamin stayed with her and Kyle at their shared apartment after Jessica was arrested in December 2022. Patricia had contact with Benjamin only about six times prior, and Kyle had started to have visitation with Benjamin only the previous month. Patricia felt neither she nor Kyle had the skills necessary to care for Benjamin's needs, and that Benjamin needed to be in the "autistic programs" he had been pulled from. She also felt that Jessica was neglecting her "motherly duties," as she continued to have Benjamin stay the night at Patricia's house following Jessica's release. In response, Patricia contacted Benjamin's prior foster mother and dropped him off at her house without Jessica's or Kyle's knowledge.

The prior foster mother had provided care for Benjamin for 2 years 9 months between his 2019 removal and 2021 reunification. She testified that, prior to reunification in 2021, Benjamin was involved in OT, physical therapy (PT), speech therapy, and ABA. He knew hundreds of verbal words and could somewhat verbally communicate. He also knew and used about two dozen American Sign Language (ASL) signs consistently and used an assistive communication device to communicate his basic needs to others. Although not fully potty trained, he was using the toilet more than once per day.

The foster mother testified that when Patricia dropped Benjamin off at her house in December 2022 he appeared emotionally distraught, angry, and exhausted. He was subsequently placed in her care. According to the foster mother, when Benjamin was returned to her, he did not know any verbal words or ASL signs. His assistive communication device was also no longer functioning. Benjamin was not current with his medical, dental, or vision appointments. He never had a "seven-year-old check-up" and he was required to undergo a major dental surgery for extensive tooth cleaning and numerous cavity fillings. Benjamin had previously been prescribed leg braces but did not have them when he returned in 2023.

Benjamin remained in this foster home at the time of the termination trial. He was still struggling with potty training and had only used the toilet about three times in the previous year. Benjamin struggled with behavioral issues; he had a difficult time regulating emotions and was violent. According to his foster mother, Benjamin's behavioral issues were triggered, in part, by an inconsistent schedule and visits with Jessica. Jessica's visitation attendance was inconsistent, and she had only attended approximately 40 percent of the visits scheduled in the previous year.

Sarah Sacco-Rohde was assigned as Benjamin's DHHS case manager from August to December 2021. She testified she had been in favor of reunification in 2021 because Jessica was doing well, she and Benjamin seemed to have a positive relationship, and he appeared happy in her care. At the time he was reunified with Jessica, Benjamin was still developmentally delayed but was progressing. ABA was discontinued in October, but Sacco-Rohde had confirmed that Jessica had either set up, or was in the process of setting up, necessary evaluations for Benjamin to start ABA before the case was closed in December.

Dr. Mary Mikuls, a licensed pediatrician, provided care for Benjamin during both periods of his time in foster care. In 2019, Benjamin's medical records reflected that he had not seen a pediatrician since his "one-year visit" and he was not current on vaccinations. Mikuls observed he had significant developmental delays, he was malnourished, and was unable to walk, talk, or feed himself. His lower extremities were weak, and his joints were stiff, indicating he had been unable to move. Her observations were consistent with evidence that he had been confined in a crib with a baby gate zip tied to the top for some time. Due to the weakness of his legs, Benjamin was prescribed leg braces. Benjamin had numerous cavities and digestive issues, which Mikuls believed were caused by being exclusively bottle fed. Although it is medically recommended that bottle feeding stop when a child reaches the age of 1, Benjamin was 3 years old. He also had behavioral issues and no sleep schedule.

Mikuls ultimately determined Benjamin was between 6 and 9 months old developmentally and referred him to a neurologist to determine whether his delays were the result of a primary brain issue. The neurologist discerned his developmental delays were due to child abuse and neglect.

When Mikuls saw Benjamin in August 2021, he had progressed significantly and was 18 months old developmentally. He was able to speak some words, could walk, and had made progress regarding his behavioral issues.

Mikuls saw Benjamin again after his 2023 removal and she observed his development had regressed significantly. His medical records indicated he had not received any medical care from early 2022 until removal in 2023. Benjamin was walking but no longer spoke any verbal words or used ASL, and he had lost weight, was not using leg braces, had the same digestive issues, had a poor sleep schedule, and was very agitated.

Mikuls last saw Benjamin in early January 2024. She observed he was less agitated and said a few single words, but he was struggling with potty training and poor sleep. It was reported that he slept worse after having visits with Jessica.

Mikuls determined speech therapy, OT, PT, and ABA were medically necessary for Benjamin and, although waitlists for ABA were long, it typically did not take longer than a few months to begin the therapy. If Benjamin continued to be involved in these things, there was hope his condition would improve. However, if Benjamin were to return to a neglectful environment it would be devastating to his development. She expressed concern regarding Benjamin being returned to Jessica's home because of "what has happened twice when he was placed in her care."

Dr. Suzanne Haney, a child abuse pediatrician at Children's Nebraska and the medical director of the Children's Advocacy Team and Project Harmony, observed Benjamin after all three removals. She observed Benjamin in 2016 after he was admitted to the hospital due to an overdose, and she observed him again in 2019. At the time he presented in 2019, Benjamin appeared to be "almost feral." He was developmentally delayed, and she had "concern that it was the result of neglect."

Haney also observed Benjamin in January 2023. Based on her observations, Haney formed an opinion that Benjamin had suffered abuse and severe, repeated neglect, and she clarified the type of regression she had observed was not typical among children with autism. She stated that Benjamin needed PT, speech therapy, OT, and ABA to thrive and develop. Given his developmental regression, placing him back into Jessica's home would risk his issues becoming more severe than they already were, and would further limit the possibility he would ever be independent.

Sharon Keeley, the DHHS child and family services specialist assigned to Benjamin's case in February 2023, also testified and her court reports prepared in July 2023 and January 2024 were received into evidence. Keeley's reports show that Benjamin was diagnosed with autism in February 2021. She testified that Benjamin needed stability and routine and a parent who understands how to parent a child with autism.

According to Keeley, supervised visitation was generally inconsistent, and when visitation was inconsistent, Benjamin's behaviors increased. There was a period when visitation was canceled by the agency because the visitation workers had transportation issues, but visits were also canceled at Jessica's request or because she failed to confirm appointments. Keeley testified that when visitation did occur, Jessica was typically engaged, responded effectively to Benjamin's behaviors, and treated him with appropriate respect. However, Keeley's 2023 court report states that Jessica "continues to be a barrier in [Benjamin's] continuing of care" during visitation because she was not keeping Benjamin's ABA implemented potty training schedule and was giving him foods which were bad for his teeth.

The record reflects DHHS filed a motion to suspend visitation, which was granted in March 2024. Keeley's 2024 report shows numerous observations and reports were made, which supported the conclusion that Benjamin's behavioral issues noticeably decreased when visits with Jessica did not occur for long periods of time.

Although the adjudication order required Jessica to have monthly contact with the case manager, Keeley was able to meet with Jessica only six times in the prior 13 months. Keeley made

efforts to contact Jessica every month and there were times she reached out to schedule family team meetings, walkthroughs, and meetings but did not receive a response.

Jessica reported having approximately five different jobs throughout the case, all of which she was unable to hold long term. Moreover, Jessica had moved between numerous mental health and substance abuse treatment facilities. Due to the lack of stability and longevity of these living arrangements, Keeley did not consider these facilities to be safe and suitable housing. Also, Keeley had been able to perform the required walkthrough of only two of these residences. At the time of trial, Jessica was residing at a facility which was appropriate for reunification.

Keeley was unaware of any substance abuse treatment that Jessica had completed since the case began. Her 2024 report also shows that Jessica tested positive for alcohol in September and November 2023, and that she failed to submit to testing on various occasions between October and December 2023. Keeley expressed that she was concerned about Jessica's substance abuse and mental health.

Keeley opined it was in Benjamin's best interests for Jessica's parental rights to be terminated because Jessica was not a fit parent and was unable to provide for Benjamin mentally, physically, emotionally, or academically, or meet his needs on a day-to-day basis. Keeley stated that since the case began in January 2023, Jessica had failed to gain the skills necessary to care for Benjamin.

On July 10, 2024, the juvenile court entered an order terminating Jessica's parental rights. The court found that the State had proven statutory grounds existed under § 43-292(2) and (3), and that termination was in Benjamin's best interests. Jessica appeals.

ASSIGNMENTS OF ERROR

Jessica assigns, restated, that the juvenile court erred in finding that the State proved (1) statutory grounds for termination of her parental rights existed under § 43-292(2) and (3), (2) reasonable efforts were not required because she subjected Benjamin to aggravated circumstances, and (3) that termination of her parental rights was in Benjamin's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

ANALYSIS

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. See *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). The State must prove these facts by clear and convincing evidence. *Id.*

*Statutory Grounds for Termination.*

Jessica assigns that the juvenile court erred by finding that the State presented sufficient evidence to support termination of her parental rights pursuant to § 43-292(2). She argues that she

and Benjamin had a positive relationship as seen during visitation, she showed care for Benjamin during her arrest, she had demonstrated her ability to provide for necessities, and she had been proactive in meeting Benjamin's needs since reunification in 2021.

Section 43-292(2) provides that parental rights may be terminated when the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. The question of what constitutes neglect and necessary parental care and protection is generally determined on a case-by-case basis. See *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000) (unsanitary house and unkempt children). See, also, *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999) (addiction to drugs or alcohol). Past neglect, along with facts relating to current family circumstances—which go to best interests—are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Gabriel B., supra*. A parent's failure to put themselves in a position to regain possession of their children can establish substantial, continual, and repeated neglect. See *id.*

Although there was some evidence that Jessica and Benjamin had a positive relationship after the 2019 removal and that Jessica reacted appropriately to Benjamin during visitation during the instant case, the evidence also showed supervised visitation was inconsistent and was canceled on various occasions. Although not all cancellations were attributable to Jessica, there were a number of times in which she failed to communicate with supervised visitation workers or canceled appointments. Also, Keeley and other witnesses notably agreed that Benjamin needed routine and consistency, and the foster mother testified she attributed some of his increased behaviors to inconsistency in his schedule and visitation with Jessica.

Visitation was eventually discontinued due to concerns based on the observations of the foster mother, Benjamin's academic team, and behavioral physician, as well as reports submitted by his special education teacher, guardian ad litem, and the DHHS supervisor; specifically, the 2024 court report states Benjamin's teachers kept a log of his behaviors before and after visitation with Jessica, which indicated that Benjamin's aggressive behaviors would increase greatly after visitation, and he would be more agitated. Benjamin would also show less of a desire to participate in daily activities and would sleep most of the school day after having visits.

Evidence showed consistency was important to Benjamin's well-being due to his autism diagnosis. There was evidence that Benjamin's behaviors worsened when visitation was inconsistent. Jessica's inconsistency with visitation indicates her disregard for the importance of Benjamin having a consistent schedule. Further, Keeley's 2023 report stated that observations during visitation showed Jessica "continued to be a barrier" to Benjamin's care. She gave him inappropriate foods and failed to follow his ABA implemented potty training schedule.

While Jessica asserts that she showed concern for Benjamin during her arrest and made arrangements for him to stay with Kyle and Patricia during her incarceration, Kyle and Patricia had limited prior interaction with Benjamin and had little idea how to care for his needs. Although Benjamin appeared to be "fine" at the probation office after Jessica's release, Romanek had little interaction with him, and he was taken into a separate room for the great majority of the appointment. The ultimate result of Benjamin staying with Kyle and Patrica was Benjamin being dropped off with his prior foster mother, and Jessica being unaware of his whereabouts.

Further, contrary to Jessica's assertion, the evidence showed she was not proactive in meeting Benjamin's needs since the 2021 reunification. The evidence showed Benjamin needed a home with structure, stability, and caregivers who made sure he had access to the recommended services and would provide him with stable housing, food, clothing, and medical care, and that Jessica failed to provide these things. Throughout the case, Jessica had unstable housing and inconsistent employment. Most of Jessica's housing was determined to be inappropriate for Benjamin and, although her most recent housing was appropriate, Jessica had only lived here 1 week.

We also note that Jessica was working on these same goals of stable housing and employment in the spring of 2019. Jessica was inconsistent in her communication with Keeley, which resulted in Keeley being unable to have walkthroughs of her residences and therefore unable to determine their appropriateness. The lack of sustainable progress in these areas over the past 5 years and lack of engagement with the case manager shows Jessica is unable to provide such necessities for Benjamin.

There was evidence that Jessica had been using drugs during the two prior removals and that Benjamin had been exposed to methamphetamine in 2019. Jessica also tested positive for methamphetamine, amphetamines, ecstasy, and alcohol while Benjamin was in her care in 2022. Further, while her drug tests were clean for a period of time during this case, she reported using methamphetamine three times in March 2023 and her tests in September and November 2023 were positive for alcohol, in violation of her probation. She also failed to submit to testing multiple times between September and December 2023. It is notable that Jessica entered various substance abuse treatment facilities throughout this care; however, there was no evidence that she had successfully completed a substance abuse treatment program, or that she had completed the treatment recommended by the substance use evaluation.

Most concerning is the regression that Benjamin showed following his reunification with Jessica in 2021. The developmental delays he exhibited when removed in 2019 had improved significantly by early 2021 when they were reunited. Multiple witnesses testified that, between 2019 and 2021, Benjamin developmentally progressed and was able to speak verbal words, use ASL and his assistive communication device, and he was making progress in potty training and with behavioral issues. However, the evidence at trial showed that any developmental progress Benjamin had made during his first placement in foster care was essentially undone between September 2021 and January 2023. Upon his removal in 2023, Benjamin was unable to speak verbal words, he did not use any ASL, and his potty training and behaviors had regressed. Haney opined that Benjamin's developmental delays were due to severe and repeated neglect.

Although OT, ABA, and speech therapy were medically necessary for Benjamin's development and were recommended by his IEP, he did not participate in ABA after reunification, and Jessica removed him from the other therapies some time prior to December 2022. We note there was evidence which showed Jessica had made efforts to place Benjamin on a waiting list for ABA and that providers were limited in the area. However, a child could typically begin ABA within a matter of months. Benjamin did not participate in ABA after October 2021 despite being in Jessica's care for over a year. Also, Benjamin rarely used his assistive communication device after reunification, as Jessica did not send it to school or have it charged. When he returned to foster care, the device no longer worked.

When Benjamin returned to foster care in 2023, a review of his medical records showed he was not up to date on medical care. He saw a doctor only once after reunification and did not have an annual checkup. Benjamin no longer had his leg braces, and he was experiencing the same digestive issues as in 2019. Also, although his need for dental care was known prior to reunification, upon his removal in 2023, he was required to have an extensive dental procedure. It was also observed that he had lost weight.

At the time of trial, Benjamin was 8 years old and had spent nearly 4 years of his life in foster care. The fact that the instant proceeding marks the third time that Benjamin has been removed from Jessica's home shows that she is unstable and unable to provide for his needs. Moreover, the noticeable decline in Benjamin's development and health while in her care shows a pattern of severe and repeated neglect by Jessica. Since his removal in 2023, Jessica has failed to show she has been sufficiently rehabilitated so as to put herself in a position to regain custody of Benjamin.

The juvenile court did not err in finding clear and convincing evidence of grounds for termination under § 43-292(2). Because the State presented clear and convincing evidence that Jessica substantially and continuously or repeatedly neglected to give Benjamin necessary parental care and protection, statutory grounds for termination of Jessica's parental rights exists. Because we have found grounds existed for termination under § 43-292(2), we need not address Jessica's assignment of error pertaining to lack of evidence for termination under § 43-292(3). See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

*Reasonable Efforts Not Required.*

Jessica assigns as error that the juvenile court erred in finding the State proved reasonable efforts were not required because she had subjected Benjamin to aggravated circumstances. However, as it relates to termination proceedings, the Nebraska Supreme Court has stated that "reasonable efforts to reunify a family are required under the juvenile code *only* when termination is sought under § 43-292(6)." *In re Interest of Mateo L. et. al*., 309 Neb. at 581, 961 N.W.2d at 528 (citing *In re Interest of Hope L. et al*., 278 Neb. 869, 891, 775 N.W.2d 384, 400 (2009)). Because we have concluded, upon our de novo review, that clear and convincing evidence exists to terminate Jessica's parental rights under § 43-292(2), we need not determine whether the juvenile court erred in finding that reasonable efforts were not required under § 43-283.01. See *In re Interest of Jade H. et al.*, 25 Neb. App. 678, 911 N.W.2d 276 (2018) (declining to address necessity of reasonable efforts when termination was proper under subsection (9) related to aggravated circumstances).

*Best Interests and Unfitness.*

Jessica assigns that the juvenile court erred in finding that termination of her parental rights was in Benjamin's best interests. She contends that she and Benjamin have a positive relationship, she had established an IEP and sought out ABA services, her drug tests had been clean, she had safe and appropriate housing, and she had made substantial progress. We disagree.

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Whereas statutory grounds are based on a parent's past conduct, the

best interests inquiry focuses on the future well-being of the child. *In re Interest of Mateo L. et al., supra*.

A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.*

Although the term "unfitness" is not expressly stated in § 43-292, the Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. See *In re Interest of Mateo L. et al., supra*. In this context, parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. The best interests and parental unfitness analyses require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *Id.*

Based on Jessica's and Benjamin's history with DHHS, we agree that termination of Jessica's parental rights is in Benjamin's best interests because she has proved herself incapable of parenting him. Following Benjamin's removal in 2019, he made marked improvements, both developmentally and behaviorally; however, upon their reunification in 2021, Jessica failed to continue the care and programming necessary to sustain, much less improve, his development. As set forth above, Benjamin regressed dramatically both physically and behaviorally. Jessica fails to appreciate the necessity of treatment needed for Benjamin's well-being as well as for herself as it relates to her substance abuse. Additionally, her inconsistency in visitation negatively impacted Benjamin, as did her inability to maintain stable income and housing.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Cameron L. & David L., supra.* Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.* Benjamin has been removed from Jessica's custody on three occasions and has spent a total of nearly four of his eight years of life in foster care. He cannot continue to be suspended in foster care while Jessica is unable to rehabilitate herself. Thus, the evidence presented by the State was clear and convincing that Jessica was unfit, and termination of her parental rights was in Benjamin's best interests.

CONCLUSION

For the foregoing reasons, we affirm the juvenile court's order terminating Jessica's parental rights.

AFFIRMED.

- 11 -